**Douglas W. SCHWENK,**
**Plaintiff–Appellee,**

v.

**James HARTFORD; Steve Sinclair; Robert Mitchell, Defendants–Appellants.**

**No. 97–35870.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 11, 1999

Filed Feb. 29, 2000

Nancy J. Krier, Assistant Attorney General, Olympia, Washington, for the defendants-appellants.

Jeffry K. Finer, Finer and Pugsley, Spokane, Washington, for the plaintiff-appellee.

Before: FLETCHER, REINHARDT, and THOMAS, Circuit Judges.

REINHARDT, Circuit Judge:

Robert Mitchell, a Washington state prison guard, appeals the district court's denial of his motion for summary judgment in a case in which a male-to-female transsexual prisoner, Douglas ("Crystal") Schwenk, sought damages as a result of Mitchell's alleged attempt to rape her.[1] Following the alleged assault, Schwenk sued various prison officials including Mitchell both under Section 1983, for a violation of her Eighth Amendment rights, and under the Gender Motivated Violence Act (GMVA).[2] Mitchell's summary judgment motion was based on qualified immunity.

With respect to Schwenk's Section 1983 claim, Mitchell argues that he is entitled to qualified immunity because the allegations amount only to sexual harassment and not to the sort of sexual attack proscribed by the Eighth Amendment. With respect to Schwenk's GMVA claim, Mitchell asserts that he is entitled to qualified immunity because the constitutionality of the Act was not clearly established and its applicability under the circumstances of this particular assault was far from clear. For the reasons set forth below, we hold that the district court properly denied Mitchell's

---

1. In using the feminine rather than the masculine designation when referring to Schwenk, we follow the convention of other judicial decisions involving male-to-female transsexuals which refer to the transsexual individual by the female pronoun. *See, e.g., Murray v. United States Bureau of Prisons*, 106 F.3d 401, 401 n.1 (6th Cir.1997) (unpublished disposition); *Meriwether v. Faulkner*, 821 F.2d 408, 408 n. 1 (7th Cir.1987).

2. The GMVA was enacted as subtitle C of the Violence Against Women Act of 1994. *See* 42 U.S.C. § 13981.

motion on the Section 1983 claim, but erred with respect to the GMVA.

## BACKGROUND[3]

■ Douglas (Crystal) Schwenk asserts that she is a pre-operative male-to-female transsexual who plans someday to obtain sex reassignment surgery.[4] Schwenk testified that she realized that she was psychologically female by the age of 12, and that she used illegally-obtained female hormones prior to incarceration, although she never received any medical or psychiatric treatment for gender dysphoria, the technical diagnosis for transsexuality. According to Schwenk, she considers herself female and has been known as "Crystal Marie" since early adolescence. She has shoulder-length hair, is extremely soft-spoken and feminine, cries easily, and uses make-up and other female grooming products when possible.

In June of 1993, Schwenk was incarcerated in the all-male Washington State Penitentiary in Walla Walla. In September of 1994, she was transferred to the prison's medium security Baker Unit, where Robert Mitchell was employed as a guard. Mitchell recalls that shortly after Schwenk arrived at Baker Unit, other inmates told him that Schwenk was homosexual. Mitchell admits that soon after that, Schwenk told him that she intended to have a sex change operation after her release from prison, and that she repeated this assertion to him "from time to time." Schwenk testified that she also told other prison officials that she was transsexual. According to Schwenk, Mitchell referred to her as Crystal, not Douglas.

Schwenk alleges that shortly after she arrived in Baker Unit, Mitchell subjected her to an escalating series of unwelcome sexual advances and harassment that culminated in a sexual assault. This harassment began with "winking, performing explicit actions imitating oral sex, making obscene and threatening comments, watching Plaintiff in the shower while 'grinding' his hand on his crotch area, and repeatedly demanding that Plaintiff engage in sexual acts with him." Then, in late 1994, Mitchell asked Schwenk to have sex with him in the staff bathroom, offering to bring her make-up and "girl stuff" in exchange for sex. When she refused and attempted to walk away, Mitchell grabbed her and groped her buttocks. Schwenk pushed him away and ran back to her cell crying. Later that day, Mitchell again approached Schwenk and told her that he had had oral sex with a former inmate and planned to have sex with his neighbor's young son, who he claimed to be "grooming" for the experience. Schwenk, who testified that she was sexually abused as a child, became terrified of Mitchell and tried to avoid him as much as possible after that. She testified that:

3. For purposes of reviewing a grant or denial of summary judgment, even in a qualified immunity case, the reviewing court must assume the nonmoving party's version of the facts to be correct. *See Liston v. County of Riverside,* 120 F.3d 965, 977 (9th Cir.1997).

4. In support of Schwenk's contention that she is transsexual and has adopted a female gender role, Schwenk submitted the declaration of Karil Klingbeil, an expert in prison sexual assault and Clinical Associate Professor of Social Work and adjunct Professor of Psychiatry and Behavioral Sciences at the University of Washington. On the basis of a clinical interview with Schwenk and an extensive review of Schwenk's medical, psychiatric, and correctional records, Klingbeil concluded that it was "apparent" that Schwenk considers

herself to be "female and would preferentially dress and live as a female, to the point of having substantive evaluation including surgery to obtain—as far as possible—female anatomy." Klingbeil furthermore concluded that

there is no indication Schwenk's behavior was in any way inconsistent with gender dysphoria during his incarceration at Walla Walla. By all accounts, Schwenk conducts himself among his peers and with his immediate authorities as a female insofar as he is allowed by prison regulations, states a preference for the female identity as opposed to mere sexual gratification for the female sex roles, and has believed this since early adolescence and even before adolescence.

Once Mitchell told me that I—I freaked. I just started trying to avoid Mitchell because I knew that—I had a feeling that he might be dangerous ... that he could be personally dangerous to me. I live in a unit where this man controls my every day essential life. That's why I was afraid to tell anybody, even the lieutenants or anybody that came into the unit because I didn't know if word was going to get back to Mitchell.

Shortly thereafter, Schwenk says that Mitchell entered her cell, saw that they were alone, and demanded that Schwenk perform oral sex on him. Schwenk refused and told him to get out. Mitchell then turned and looked behind him to make sure no one was coming, unzipped his pants, pulled out his penis, and again demanded that Schwenk perform oral sex. She again rebuffed him and again told him to leave. Although Mitchell said he would leave, he did not. Instead, according to Schwenk, Mitchell closed the door to her cell, grabbed her, turned her around forcibly, pushed her against the bars, and began grinding his exposed penis into her buttocks. Schwenk testified that she told him to "get off me Mitchell, leave me alone, get out of my house. And he—he didn't listen to me." Schwenk alleges that Mitchell ignored her struggling and continued to forcibly rub his penis against her, saying "oh baby, I knew you'd be good." The attack only stopped, according to Schwenk, when Mitchell, apparently fearing detection, abruptly pushed away from Schwenk, zipped up his pants, and left hastily.

Later that week, Mitchell again demanded sex from Schwenk, who again refused. Mitchell told her that if she did not submit, he would "cross [her] out and send [her] inside to seg, give [her] a new address." Schwenk testified that she interpreted Mitchell's threat to cross her out to mean that he would get her "infracted" and transferred out of the medium security Baker Unit into the main cell house, where she would be at high risk for sexual attack by other inmates. On January 11, 1995, this in fact happened. Schwenk's cell was stripped, and an illegal tattoo gun made out of a ball-point pen was discovered. As a result, she lost some accumulated good time credit and was sent to segregation for 28 days. In addition, she was moved to a multi-man cell in the maximum security Unit 6 of the main institution, where she "live[d] in a constant state of fear and anxiety," wondering whether she would be raped or otherwise assaulted.

Schwenk subsequently filed an administrative grievance regarding the attack by Mitchell. That grievance was denied as untimely, however, because it was filed ten days after the attack and all such complaints must be made within five days of the alleged incident. Approximately one year after the attack, Schwenk filed a pro se complaint in federal court against Mitchell and various institutional defendants; in that complaint, she alleged that the sexual assault violated her Eighth Amendment rights. The district court appointed counsel for Schwenk, and an amended complaint adding a claim under the Gender–Motivated Violence Act was filed. After dismissing the institutional defendants, the district court converted Mitchell's motion to dismiss into a motion for summary judgment and allowed discovery to proceed.

Schwenk claimed that she was traumatized by Mitchell's assault and by his threats of retaliation. In support of this assertion, Professor Klingbeil found that Schwenk did indeed suffer psychological injury resulting from Officer Mitchell's attack. Moreover, Klingbeil found Schwenk's description of the incident in her cell to be credible because it was consistent with her previous testimony, her intense fear of Mitchell, and the symptoms of post-traumatic stress that Schwenk displayed. In particular, Klingbeil noted that Schwenk had improved since being transferred out of Walla Walla—and away from Officer Mitchell—because she felt that she was "safe from retaliation and treated fairly by staff and inmates." Klingbeil found that Schwenk's reactions and symptoms

clearly established "that the attack by Mitchell profoundly disturbed Schwenk, left [her] feeling wholly vulnerable to [her] attacker, and experiencing great fear and dread."

Following discovery, Mitchell renewed his request for summary judgment based on what he presents on appeal as two separate grounds: first, the alleged failure to state a claim under the GMVA; and second, qualified immunity with respect to both the GMVA and Section 1983 Eighth Amendment claims. Mitchell raises three points regarding the first ground. First, Mitchell asserts that the acts of which he was accused do not satisfy the statutory definition of a crime of violence. Second, he asserts that Schwenk is male and that the GMVA does not protect men who are raped or sexually assaulted by other men. Third, Mitchell argues that in general, transsexuals are not covered by the act. In particular, Mitchell argues that Schwenk's allegations do not constitute a claim that the attack was based on gender, as required by the statute, but rather on transsexuality. Therefore, Mitchell claims, the requisite gender motivation and animus are absent.

All of these contentions may properly be considered as a part of Mitchell's qualified immunity claim, along with his related assertion that he is entitled to such immunity because, at the time of the alleged assault, no court had yet applied the GMVA to a prison sexual assault on a transsexual by a guard. Mitchell also bases his immunity claim on the contention that the GMVA itself was not clearly established because the constitutionality of the act was in doubt at the time of the alleged attack. As to Schwenk's Eighth Amendment claim, Mitchell asserts that he is entitled to qualified immunity from Section 1983 liability because Schwenk's allegations, even if true, describe only sexual harassment, not sexual assault. The district court rejected all of Mitchell's contentions, and this interlocutory appeal followed. Because the legal issues are simpler, we first discuss Mitchell's qualified immunity claim regarding Section 1983 and the al-leged Eighth Amendment violation, before turning to the GMVA.

### *ANALYSIS*

I. *Jurisdiction over the Interlocutory Appeal*

Although the denial of a summary judgment motion is not ordinarily an appealable order, this court has jurisdiction to consider an interlocutory appeal where the ground for the motion in question is qualified immunity. *See Behrens v. Pelletier,* 516 U.S. 299, 312, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996). Our jurisdiction in such cases, however, is limited to questions of law; it does *not* extend to claims in which the determination of qualified immunity depends upon disputed issues of material fact. *See Johnson v. Jones,* 515 U.S. 304, 319, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); *Knox v. Southwest Airlines,* 124 F.3d 1103, 1106 (9th Cir.1997). Nonetheless, this court is not precluded from reviewing such an order on appeal merely because some of the facts are disputed; rather, for purposes of determining whether the alleged conduct violates clearly established law of which a reasonable person would have known, we assume the version of the material facts asserted by the non-moving party to be correct. *See Behrens,* 516 U.S. at 312, 116 S.Ct. 834; *Liston,* 120 F.3d at 977. On this appeal, then, we consider whether, resolving all factual disputes in Schwenk's favor, Mitchell is entitled to qualified immunity from Schwenk's claims under Section 1983 and the GMVA. We conclude that he is not entitled to qualified immunity with respect to Section 1983—the Eighth Amendment claim—but that, because the applicability of the GMVA to Mitchell's conduct was not clear at the time of the assault, he is entitled to such immunity with respect to the GMVA.

### II. *Schwenk's Claims*

Law enforcement officers, including prison guards, enjoy qualified immunity from civil damage suits unless their conduct violates "clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Under this standard, summary judgment based on qualified immunity is improper if, under the plaintiff's version of the facts, and in light of the clearly established law, a reasonable officer could not have believed his conduct was lawful. *See Grossman v. City of Portland,* 33 F.3d 1200, 1208 (9th Cir.1994).[5] Thus, "[a]n official's claim of qualified immunity will be defeated if, 'in the light of pre-existing law' the unlawfulness of his conduct was 'apparent.'" *Id.*

▇▇▇ Once a defendant claims that he is entitled to qualified immunity, the court is to determine "not only the currently applicable law, but whether that law was clearly established at the time an action occurred." *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. In *Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), the Supreme Court set forth the "proper analytical framework" for making that determination. In that case, the Court held that a necessary precursor to determining whether the right in question · was "clearly established" at the time is the "threshold" inquiry whether the plaintiff has in fact asserted a violation of that right. *Id.* at 231–32, 111 S.Ct. 1789. Only after the court concludes that the plaintiff has sufficiently stated a claim for the violation of his rights is the court to determine whether "the contours of the allegedly violated right were sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right." *Liston,* 120 F.3d at 975 (citing *Osolinski v. Kane,* 92 F.3d 934, 936 (9th Cir.1996)). Deciding "this purely legal question permits courts expeditiously to weed out suits which fail the test without requiring a

defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on the merits." *Siegert,* 500 U.S. at 232, 111 S.Ct. 1789; *see also Knox,* 124 F.3d at 1107 ("If a plaintiff fails to allege a violation of clearly established law, the court need not even reach the other issues presented regarding qualified immunity.").

▇▇▇ Therefore, we must affirm the district court's denial of summary judgment if: (1) Schwenk has alleged an actual violation of her rights; and (2) "the contours of the allegedly violated right were sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right." *Liston,* 120 F.3d at 975 (citing *Osolinski,* 92 F.3d at 936).

### A. *Schwenk's Eighth Amendment Claim*

▇▇▇ The Eighth Amendment proscribes the infliction of cruel and unusual punishment on prisoners. Whether a particular event or condition in fact constitutes "cruel and unusual punishment" is gauged against "the evolving standards of decency that mark the progress of a maturing society." *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). However, the Supreme Court has clearly and repeatedly held that "when prison officials maliciously and sadistically use force to cause harm contemporary standards of decency are *always* violated." *Id.* at 9, 112 S.Ct. 995 (emphasis added). In such cases, no lasting physical injury is necessary to state a cause of action. Rather, the only requirement is that the officer's actions be "offensive to human dignity."[6] *Felix v. McCarthy,* 939 F.2d 699, 702 (9th Cir.1991).

---

**5.** This court has variously characterized the inquiry into qualified immunity as either two-part or three-part. *See id.,* 33 F.3d at 1208 nn. 14–15. However, the specifics of the particular characterizations are not particularly important. As we observed in *Knox,* "[r]egardless of any formalistic difference in description, our approach has been consistent

and essentially equivalent." 124 F.3d at 1107 n.2. That approach has always been to "determine whether a reasonable officer could have believed lawful the particular conduct at issue." *Id.* at 1107 (citations omitted).

**6.** Mitchell argues that he is entitled to qualified immunity because Schwenk has not pro-

A sexual assault on an inmate by a guard—regardless of the gender of the guard or of the prisoner—is deeply "offensive to human dignity." *Id.* "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). As a result, in *Farmer,* the Supreme Court held that prison officials may be held liable under the Eighth Amendment for the rape of a transsexual inmate by another inmate if the officials knew that the victim faced a substantial risk of serious harm and they disregarded that risk by failing to take reasonable measures to abate it. *Id.* at 847, 114 S.Ct. 1970. Thus, the shield that qualified immunity provides is limited to those officials who are either unaware of the risk or who take reasonable measures to counter it.

Where guards themselves are responsible for the rape and sexual abuse of inmates, qualified immunity offers *no* shield. *See Mathie v. Fries,* 935 F.Supp. 1284, 1301 (E.D.N.Y.1996) (denying qualified immunity to director of prison security because "any reasonable prison Director of Security knew that to try to force unwanted and prohibited sexual acts on a powerless inmate is objectively unreasonable and in violation of the inmates rights");[7] *Women Prisoners of the Dist. of Columbia Dept. of Corrections,* 877 F.Supp. 634, 665 (D.D.C.1994) ("Rape, coerced sodomy, unsolicited touching of women prisoners' vaginas, breasts and buttocks by prison employees are 'simply not part of the penalty that criminal offenders pay for their offenses against society'") (quoting *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970), *aff'd in part and vacated in part,* 93 F.3d 910 (D.C.Cir.1996). In the simplest and most absolute of terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established prior to the time of this alleged assault, and no reasonable prison guard could possibly have believed otherwise.

Moreover, no case is necessary to establish the truth of the underlying proposition. The purpose of qualified immunity is to "ensure that defendants 'reasonably can anticipate when their conduct may give rise to liability' by attaching liability only if '[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *United States v. Lanier,* 520 U.S. 259, 270, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Ordinarily, courts look to prior decisional law in order to determine whether the "contours of the right" have been defined at an appropriate level of specificity. This does not mean, however, that the "very action in question [must have] previously been held unlawful." *Mendoza v. Block,* 27 F.3d 1357, 1361 (9th Cir.1994); *see also Alexander v. Perrill,* 916 F.2d 1392, 1398 (9th Cir.1990) ("[T]he law simply does not require that we find a prior case with the exact factual situation in order to hold that the official breached a clearly established duty."). Instead, qualified immunity is inappropriate where the preexisting law was sufficient to provide the defendant with "fair warning" that his conduct was unlawful. *Lanier,* 520 U.S. at 270–71, 117 S.Ct. 1219.

duced any evidence that she sustained any serious injury. However, as stated above, there is no requirement that the plaintiff produce such evidence where the assault is one, such as attempted rape, that lacks any legitimate penological justification and is "offensive to human dignity." Moreover, Schwenk did in fact produce evidence in the form of the affidavit of Karil Klingbeil that Schwenk sustained serious emotional harm as a result of the attack.

7. In *Mathie,* an inmate was anally raped by a correctional officer. The district court held that the "sexual abuse and sodomy perpetrated ... against the powerless inmate was applied maliciously and sadistically in order to afford personal gratification to Fries. These malicious acts violated all contemporary standards of decency." 935 F.Supp. at 1300.

■ Where the law has provided the defendant with such fair warning, "closely analogous pre-existing case law is not required to show that the law is clearly established." *Mendoza,* 27 F.3d at 1361. To the extent that Mitchell argues that the law is clearly established that a prison guard may be liable for allowing someone else to sexually assault an inmate, but not for an assault that he himself commits, his position, both legally and as a matter of common sense, is absurd. In light of pre-existing Eighth Amendment law, a reasonable prison guard simply could not have believed that he could with impunity enter the cell of a prisoner (transsexual or otherwise), unzip his pants, expose himself, demand oral sex, and then, after being refused, grab the prisoner, push her up against the bars of the cell, and grind his naked penis into her buttocks.

■ Mitchell next asserts that Schwenk's allegations constitute at worst "same-sex sexual harassment" and not sexual assault. According to Mitchell, it was not clearly established at the time of the incidents that same-sex sexual harassment of prisoners by guards was unconstitutional. In so arguing, he points to our decision in *Blueford v. Prunty,* 108 F.3d 251 (9th Cir.1997), for support. *Blueford,* however, is entirely distinguishable. Our holding in that case was specifically predicated on the fact that the officer in question never actually touched the prisoner but only subjected him to *verbal* abuse. *See id.* at 254. In contrast, here Schwenk alleges that she was subjected to forcible sexual contact by a state prison guard. As set forth above, the law governing that conduct was utterly unambiguous and clearly established at the time of the alleged attack. When the Supreme Court held in *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970, that "[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society,'" it did not qualify that statement depending on whether the assault in question was same-sex or opposite-sex (or whether the assault was committed by an inmate or a prison official). In other words, the gender of the

rapist or the victim does not make the assault in question any more acceptable under the Eight Amendment.

■ The point of qualified immunity is to allow officials to take action "with independence and without fear of consequences." *Harlow,* 457 U.S. at 819, 102 S.Ct. 2727 (citing *Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)). There is, however, no societal interest in allowing prison guards to rape (or attempt to rape) inmates "with independence" or "without fear of consequences." The minimum consequences a sexually predatory guard should anticipate for such conduct is civil liability. Viewing the facts in the light most favorable to Schwenk (as we must at this stage of the proceeding), we conclude that the district court acted correctly in denying Mitchell qualified immunity with respect to Schwenk's Eighth Amendment claims.

### B. *GMVA Claim*

■ The Gender Motivated Violence Act ("GMVA") was enacted in 1994 as part of the comprehensive Violence Against Women Act. In part, the Act provides a new federal civil-rights cause of action for victims of gender-motivated violence—defined by the Act as "crime[s] of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." 42 U.S.C. § 13981(c). The Act expressly applies not only to private but also to public conduct—specifically, to actions taken under color of state law. *See* 42 U.S.C. § 13981(c). Whether a particular act of violence is gender-motivated and thus falls within the Act's scope is determined in light of the "totality of the circumstances." *See* S. Rep. 103–138, pt. 4 (1993); *see also Crisonino v. New York City Hous. Auth.,* 985 F.Supp. 385, 391 (S.D.N.Y.1997).

In considering Mitchell's claims, we first discuss whether Schwenk failed to state a claim under the GMVA, and second, whether Mitchell is entitled to qualified

immunity with respect to Schwenk's claim under the GMVA.[8] Because we conclude that, although Schwenk has stated a claim under the GMVA, the law governing that claim was not clearly established, we reverse the district court's judgment as to the GMVA claim.

### 1. *Did Schwenk state a claim under the GMVA?*

On appeal Mitchell contends that Schwenk failed to state a cognizable claim under the GMVA. He bases this contention on three points. First, he argues, the acts of which he was accused do not satisfy the statutory definition of a crime of violence. Second, he contends that men do not fall under the protections of the GMVA. Third, he asserts that transsexuals are not covered by the Act in general, and that in particular the requisite gender motivation and animus are absent in the case before us. We consider each of these contentions in turn.

▇▇▇ In order to state a claim under the GMVA, Schwenk must first allege that she was the victim of a "crime of violence." 42 U.S.C. § 13981(c). Under the GMVA, a crime of violence is defined as "an act or series of acts that would constitute a felony against the person ... whether or not those acts have actually resulted in criminal charges, prosecution, or conviction." *Id.* § 13981(d)(2). Mitchell argues that his "actions, even if true, have not been determined to be actions which would constitute a crime of violence, or actions which presented a serious risk of physical injury." He points out that Schwenk sought no

treatment for physical or mental injuries from prison authorities, that she did not pursue her prison grievance to the final stage once it was denied as untimely, and that she did not mention Mitchell's actions in her infraction hearing, press criminal charges, or file a criminal complaint. However, Mitchell's arguments are wholly inconsistent with the plain language of the statute, which specifically excludes such factors from consideration. *See id.* 13981(e)(2) ("[n]othing in this section requires a prior criminal complaint, prosecution, or conviction to establish the elements of a cause of action under" the GMVA). The district court performed the correct analysis and properly concluded that Schwenk's allegations, if proved, would fall within the definition of attempted rape, which is a felony in the state of Washington. Thus, the facts and allegations in the record before us satisfy the first element required by the statute-namely, that the alleged assault constitutes a crime of violence.[9]

▇▇▇ The next question is whether the Act applies to males. As an initial matter, Mitchell contends that the district court erred in applying the statute to Schwenk because Schwenk is a man and the GMVA protects only women. In Mitchell's view, a sexual attack by one man against another cannot be "gender-motivated" under the Act.[10] However, Mitchell's interpretation of the statute as a "domestic violence law" that protects only women is plainly wrong. Although the larger bill within which the GMVA was passed was known as the Vio-

---

8. Although Mitchell presents these as two separate claims, the two inquiries are in fact both part and parcel of the qualified immunity analysis, which requires us to ask first, whether the right in question has been violated and second, whether the right was clearly-established at the time of the violation. *See Siegert,* 500 U.S. at 231–32, 111 S.Ct. 1789.

9. In considering a GMVA claim, the court reviews the facts to determine whether they would, if proved, constitute a felony, but the question of whether the elements have in fact been proved is for the jury to decide. *See Crisonino,* 985 F.Supp. at 393 (holding that

the court determines as a matter of law whether the allegations constitute a crime of violence within the meaning of the GMVA, but that "the jury will decide as a matter of fact whether the elements constituting a felony have in fact been proved in the particular case").

10. Specifically, the statute provides that "[n]othing in this section entitles a person to a cause of action ... for random acts of violence unrelated to gender or for acts that cannot be demonstrated by a preponderance of the evidence, to be motivated by gender." 42 U.S.C. § 13981(e)(1).

lence Against Women Act, the short title of the civil rights cause of action is the "Gender–Motivated Violence Act." As the district court correctly noted, the language of the civil rights statute is entirely gender-neutral and there is no indication that Congress intended to exclude men from its purview.[11]

Rather, the legislative history makes it clear that Congress specifically intended to *include* men within the statute's protection. For example, the Senate Report accompanying the bill states that the new law "creates an appropriate remedy—a civil action in Federal court—by a victim of gender-based violent crime against *his* or *her* attacker." S. Rep. 103–138, pt. III.B.5.b (1993) (emphasis added). The same Report suggested that a victim could prove gender-motivation by showing that an attacker "shouted anti-woman (or man) epithets during the assault." *Id.* Senate hearings on the bill included testimony about males who had been subjected to gender-motivated violence. *See* Sen. Hearing 101–939, at 62. Most compelling for Schwenk, however, is the public statement of the bill's author and Senate sponsor, Senator Biden, that the law was specifically intended to protect male victims of prison sexual assault:

> I might add ... in the issue of rape, a male can bring a civil rights action. There is a great deal of rape in prison of males by males. So although it is a very small portion of the problem, this is literally gender-motivated, and in a strange sense gender-neutral. If the crime is a consequence of gender-motivation and that predicate can be laid down in court, then there can be a civil rights action. In almost all rape you'd find that situation.

Senator Joseph Biden, Press Conference to Release the Senate Report on S. 11, The Response to Rape: Detours on the Road to Equal Justice, May 27, 1993, *available in* Lexis News Library, Reuter Trans. Report File. We hold, therefore, that the plain language of the statute, as well as its legislative history, make it clear that Congress intended the GMVA to apply with equal force to both men and women. This interpretation is consistent with Title VII, which the Supreme Court recently held has long protected men from sex discrimination and harassment regardless of the gender of the supervisor perpetrating the discrimination. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998).

Mitchell next contends that even if the statute applies to men, it does not apply to transsexuals in general or to Schwenk in the circumstances of this case. Mitchell's argument that the GMVA does not apply to transsexuals in general conflicts squarely with the plain language of the statute, which applies, without qualifications, to "all persons within the United States...." 42 U.S.C. § 13981(b). Mitchell also makes the more sophisticated argument, however, that we must reject Schwenk's claims that the attack occurred because of gender and that it was due in part to animus based on gender. According to Mitchell, Schwenk has alleged only that the attack occurred because of Schwenk's transsexuality, which, Mitchell contends, is not an element of gender, but rather constitutes gender dysphoria, a psychiatric illness. We disagree.

Under the statute, a crime is motivated by gender if it is "committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." *Id.* § 13981(d)(1). Congress intended proof of gender motivation under the GMVA to proceed in the same way that proof of discrimination on the basis of sex or race is

---

**11.** Another district court within this circuit recently upheld the GMVA in the context of a claim by an accused wife-beater who claimed that the law created an impermissible gender classification scheme that violated his right to equal protection. In a published opinion, the district court held that the act was gender-neutral and offered an equal level of protection to both men and women. *See Ziegler v. Ziegler*, 28 F.Supp.2d 601, 616 (E.D.Wash. 1998).

shown under Title VII. *See* S. Rep. 103–138, at 53 (1993); S. Rep. 102–197, pt. III.C.4.c., at 50 (1991). In other words, the correct test for determining whether a crime of violence is motivated by gender is whether gender was *a* "motivating factor"—it need not necessarily be the *only* motivating factor. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 249, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). As the Supreme Court held in *Price Waterhouse,*

> The critical inquiry ... is whether gender was a factor in the employment decision at the moment it was made.... [S]ince we know that the words "because of" do not mean "solely because of," we also know that Title VII meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations.

*Id.* at 241, 109 S.Ct. 1775. This standard was codified by the Civil Rights Act of 1991, which provided that a plaintiff can establish a prima facie case of employment discrimination by showing that sex was a motivating factor even if other factors also motivated the practice. *See* Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071 § 107(a), *codified at* 42 U.S.C.A. § 2000e–2(m).

In order to determine whether Schwenk has alleged that gender was a motivating factor in the attack, it is first necessary to define what is meant by gender. In the context of Title VII, federal courts (including this one) initially adopted the approach that sex is distinct from gender, and, as a result, held that Title VII barred discrimination based on the former but not on the latter. *See Holloway v. Arthur Andersen,* 566 F.2d 659, 661–63 (9th Cir.1977) (refusing to extend protection of Title VII to transsexuals because discrimination against transsexuals is on basis of "gender" rather than "sex"). Other courts held, more specifically, that "[t]he term 'sex' in Title VII refers to an individual's distinguishing biological or anatomical characteristics, whereas the term 'gender' refers to an individual's sexual identity," or socially-constructed characteristics. *Dobre v. Amtrak,* 850 F.Supp. 284, 286 (E.D.Pa. 1993); *see also Ulane v. Eastern Airlines, Inc.,* 742 F.2d 1081, 1084 (7th Cir.1984) (construing "sex" in Title VII narrowly to mean only anatomical sex rather than gender). Male-to-female transsexuals, as anatomical males whose outward behavior and inward identity did not meet social definitions of masculinity, were denied the protection of Title VII by these courts because they were the victims of gender, rather than sex, discrimination.

The initial judicial approach taken in cases such as *Holloway* has been overruled by the logic and language of *Price Waterhouse.*[12] In *Price Waterhouse,* which was decided after *Holloway* and *Ulane,* the Supreme Court held that Title VII barred not just discrimination based on the fact that Hopkins was a woman, but also discrimination based on the fact that she failed "to act like a woman"—that is,

---

12. In any case, the purpose of statutory interpretation is to "ascertain the congressional intent and give effect to the legislative will." *Pressley v. Capital Credit & Collection Serv., Inc.,* 760 F.2d 922, 924 (9th Cir.1985); *see Brothers v. First Leasing,* 724 F.2d 789, 789 (9th Cir.1984). Where limiting language present in earlier statutes is not included in later legislation, it can be presumed that the omission was intentional. *See Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). Furthermore, when Congress adopts language from case law into statutes, there is a strong presumption that Congress intends the language to have the same meaning in the statute that it has in the case law. *See Espinoza–Gutierrez v. Smith,* 94 F.3d 1270, 1275 (9th Cir.1996). We may presume that Congress, in drafting the GMVA, was aware of the interpretation given by the pre-*Price Waterhouse* federal courts to the terms "sex" and "gender" under Title VII and acted intentionally to incorporate the broader concept of "gender." This interpretation is particularly appropriate given the remedial purposes of the statute. *See Almero v. INS,* 18 F.3d 757, 762 (9th Cir.1994) ("remedial legislation should be construed broadly to effectuate its purpose"). We therefore decline to give the term "gender," as used in the GMVA, a narrow interpretation that would exclude all those, like Schwenk, who do not conform to socially-prescribed gender expectations.

to conform to socially-constructed gender expectations.[13] *Price Waterhouse*, 490 U.S. 228, 240, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). What matters, for purposes of this part of the *Price Waterhouse* analysis, is that in the mind of the perpetrator the discrimination is related to the sex of the victim: here, for example, the perpetrator's actions stem from the fact that he believed that the victim was a man who "failed to act like" one. Thus, under *Price Waterhouse*, "sex" under Title VII encompasses both sex—that is, the biological differences between men and women—*and* gender. Discrimination because one fails to act in the way expected of a man or woman is forbidden under Title VII. Accordingly, the argument that the GMVA parallels Title VII and applies only to sex is in part right and in part wrong. The GMVA does parallel Title VII. However, both statutes prohibit discrimination based on gender as well as sex. Indeed, for purposes of these two acts, the terms "sex" and "gender" have become interchangeable.

Here, it is undisputed that Mitchell knew that Schwenk considered herself a transsexual and that she planned to seek sex reassignment surgery in the future. Schwenk testified that Mitchell's demands for sex began only after he discovered that she considered herself female and that they escalated and included commentary about her transsexuality. Moreover, Schwenk testified that her appearance and mannerisms were very feminine, and that Mitchell was aware of these characteristics. In fact, Mitchell offered to bring her make-up and other "girl stuff" from outside the prison in order to enhance the femininity of her appearance. Thus, the evidence offered by Schwenk tends to show that Mitchell's actions were motivated, at least in part, by Schwenk's gender—in this case, by her assumption of a feminine rather than a typically masculine appearance or demeanor. Accordingly, we conclude that Schwenk's assertion that the attack occurred because of gender easily survives summary judgment.

■ In addition to being motivated by gender, an attack must also be "due, at least in part, to an animus based on the victim's gender." 42 U.S.C. § 13981(d)(1). This is the most troublesome part of the statute because animus is generally thought of as reflecting "hostility." Such is not always the case, however. "Animus" is defined in the *Oxford English Dictionary* as a "mental impulse, actuating feeling, disposition in a particular direction, animating spirit or temper, *usually* of a hostile character." (Emphasis added.) The term "animus" is, in fact, an ambiguous one and other courts to consider this question have combined animus and gender-motivation into a single inquiry. *See, e.g., Liu v. Striuli*, 36 F.Supp.2d 452, 474 (D.R.I.1999). This, to us, constitutes a reasonable and logical approach. In *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269–70, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993), the Supreme Court noted that, in the context of 42 U.S.C. § 1985, an "animus" requirement can be met not just by acts that are maliciously motivated, but also by acts arising out of assertedly benign or even affectionate (though objectively harmful) impulses. In essence, what animus demands is simply a strong emotion, such as is present in cases involving "sex-based intent." In other words, animus, for purposes of the GMVA, is not necessarily overt hostility; it may in some instances even involve expressed or believed affection. We conclude, therefore, that for purposes of the GMVA, it is sufficient if a strong emotional response to the victim's gender or sexual identity is partly the cause of the assault. Under such an approach, if an attack is emotionally motivated—as are all rapes and sexual assaults—it is necessarily animated by gender-animus. *See, e.g., Culberson v. Doan*, 65 F.Supp.2d 701, 706 (S.D.Ohio 1999).

---

**13.** Moreover, as the Court made clear in *Oncale*, same-sex discrimination is cognizable under Title VII under certain circumstances. *See Oncale*, 118 S.Ct. at 1001–02.

The fact that in this case the alleged crime was a sexual assault is sufficient in and of itself to support the existence of gender-based animus for purposes of the GMVA. Rape (or attempted rape) is sui generis. As several courts have noted, rape *by definition* occurs at least in part because of gender-based animus.[14] The psychological factors that underlie a particular rape or the conduct of a particular rapist are often complex as well as extremely difficult to determine. It would be both an impossible and an unnecessary task to fashion a judicial test to determine whether particular rapes are due in part to gender-based animus. With respect to rape and attempted rape, at least, the nature of the crime dictates a uniform, affirmative answer to the inquiry.

In sum, Schwenk has produced evidence and allegations that, if proved at trial, would establish a violation of her right to be free from gender-motivated violence under the GMVA. This satisfies the first part of the "analytical framework" for determining qualified immunity established in *Siegert*. We next consider whether the law was sufficiently clearly established at the time in question to provide a reasonable government official with "fair warning" that the alleged conduct was contrary to the GMVA. *Lanier*, 520 U.S. at 270–71, 117 S.Ct. 1219.

#### 2. *Was the Law Clearly Established?*

Mitchell claims that the district court erred in denying his claim of qualified immunity because this court had not yet addressed the constitutionality of the law and because at the time of the alleged assault there were no published opinions interpreting the GMVA. In Mitchell's view, he cannot be held liable under the GMVA unless there is a Ninth Circuit opinion (or, presumably, a Supreme Court opinion) holding: (1) that the statute in question is constitutional; and (2) that the statute applies specifically to the sexual assault on a male to female transsexual state prison inmate by a male prison guard. Mitchell's second point is, perhaps, more fully described as encompassing two partially overlapping arguments. The first is that it was not clearly-established that the GMVA applies to persons other than women or to prison inmates. The second is that it was not clearly established that an attempted rape motivated by the victim's transsexuality (or gender dysphoria)

---

**14.** Prison rape is a particularly serious problem. It is well-documented in both scholarly literature and reported judicial opinions that young, slight, physically weak male inmates, particularly those with "feminine" physical characteristics, are routinely raped, often by groups of men. *See Farmer v. Brennan*, 511 U.S. 825, 852–53 & n.*, 114 S.Ct. 1970 (Blackmun, J., concurring) (collecting cases); see Robert W. Dumond, *The Sexual Assault of Male Inmates in Incarcerated Settings*, 20 *Int'l J. Soc. L.* 135–157 (1992); Kevin Wright, *The Violent and Victimized in the Male Prison*, 16 *J. Offender Rehabilitation* 144 (1991), reprinted in Michael C. Braswell ed., *Prison Violence in America* 145–65 (2d ed.1991); Nobuhle R. Chonco, *Sexual Assaults Among Male Inmates: A Descriptive Study*, 68 *Prison J.* 1, 72–82 (1989); A. Nicholas Groth and Ann W. Burgess, *Male Rape: Offenders and Victims*, 137 *Am. J. of Psychiatry* 806–19 (1980). Once raped, an inmate is marked as a victim and is subsequently vulnerable to repeated violation. The victims of these attacks are frequently called female names and terms indicative of gender animus like "pussy" and "bitch" during the assaults and thereafter. *See, e.g., LaMarca v. Turner*, 662 F.Supp. 647, 691–95 (S.D.Fla.1987) (rapists told victims "that's some good pussy," that they were now "girls," and forced them to "look female and accentuate his femininity"). After they are raped, victims are consigned to "passive" female sexual and social roles within the prison. *See* Stephen Donaldson, Op. Ed., *The Rape Crisis Behind Bars*, New York Times, December 29, 1993, at A21; Gilian Mezey and Michael King eds., *Male Victims of Sexual Assault* (1992); C.L. Anderson, *Males as Sexual Assault Victims: Multiple Levels of Trauma*, 7 *J. Homosexuality* 2 (1974). In contrast, prison rapists commit assaults in part to establish and maintain a masculine gender. According to the psychological literature, *ibid.*, prison rapists strongly resist the characterization of their activities as homosexual. Instead, they conceive their sexual partners as female members of the prison social order. Thus, as with rape in general, all prison rape occurs "because of" gender—both that of the rapist and that of his victim.

meets the test for gender motivation and animus.

■ As the district court properly determined, Mitchell was wrong in his assertion that the GMVA was not clearly established law because neither this Court nor the Supreme Court had determined whether it was constitutional. Mitchell was also wrong in significant respects as to his second major point. In general, the GMVA clearly does apply to persons other than women—to men, to transsexuals, and to prison inmates; and it is not necessary that this court have decided the precise question. Nevertheless, we are compelled to conclude that, even though the GMVA prohibits the conduct involved, its applicability under the facts alleged in Schwenk's claim, was *not* clearly established at the time of the assault. Accordingly, we hold that Mitchell is entitled to qualified immunity with respect to the GMVA claim.

We will review Mitchell's contentions in order. Mitchell first contends that even if the terms of the GMVA are clear, the statute could not clearly establish the law because this court had not held that the GMVA was constitutional. Indeed, at the time of the alleged events at issue in this case, no court of appeals had yet ruled on the law's constitutionality. We note that after the events in this case, the Fourth Circuit held the GMVA unconstitutional, and that the Supreme Court has granted certiorari in order to review that question. *See Brzonkala v. Virginia Polytechnic Institute and State Univ.*, 169 F.3d 820 (4th Cir.1999) (en banc), *cert. granted*, —— U.S. ——, 120 S.Ct. 11, 144 L.Ed.2d 842 (1999). Mitchell's contention, however, is not that the Act is unconstitutional. Even when asked specifically at oral argument, he declined to take that position. Rather, he argues a different point—essentially, that statutes require judicial ratification before

they can be considered clearly-established law. We reject Mitchell's argument.

■ It is well-established that acts of Congress enjoy a strong presumption of constitutionality and that newly-passed statutes do not require judicial ratification in order to take effect. *See, e.g., United States v. X–Citement Video, Inc.*, 513 U.S. 64, 73, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) ("[W]e do not impute to Congress an intent to pass legislation that is inconsistent with the Constitution as construed by this Court."). Under this rule, state officials—like all other persons—are responsible for obeying a law passed by Congress unless the Supreme Court or, at a minimum, a United States Court of Appeals or district court in the circuit or district in which the state official performs his duties, strikes down the law as unconstitutional. Mitchell acknowledges that *no* court had done so at the time of the alleged attack. Thus, he was required to presume the statute's constitutionality and conform his conduct to that law. State officials are certainly not entitled, as Mitchell apparently believes, to ignore a new federal law in the hopes that a court will subsequently strike it down. If officials choose to ignore a federal law, they do so at their peril.[15] Accordingly, Mitchell is *not* entitled to qualified immunity from Schwenk's GMVA claim on the basis of the absence of a court opinion confirming the statute's constitutionality.

■ Mitchell's second point, as we noted earlier, in fact encompasses two arguments: first, that it was not clearly established at the time of the attack that any person other than a woman could claim the protections of the Act,[16] and second, that it was not clearly established at the time of the attack that gender motivation and animus encompassed acts motivated by a vic-

---

15. This, of course, does not preclude state officials from testing new statutes by asserting their unconstitutionality, even in the course of a qualified immunity defense.

16. We note that *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), establishing protection for men who are the victims of same-sex harassment under Title VII, had not been decided at the time of Mitchell's assaults.

tim's transsexuality. As discussed earlier, courts ordinarily look to prior case law to determine whether the "contours of the right" have been defined at an appropriate level of specificity. However, a statute itself, standing alone, may provide sufficient evidence that the law was clearly established at the time of the conduct. *See, e.g., Doe v. Petaluma City Sch. Dist.,* 54 F.3d 1447, 1452 (9th Cir.1995).

The question then is whether the GMVA did provide fair warning that the conduct in question was contrary to the statute's commands. With respect to *who* is protected by the statute, the language of the GMVA is utterly unambiguous. The statute states that "all persons within the United States shall have the right to be free from crimes of violence motivated by gender," and specifically includes prison officials and others "acting under color of state law" within its reach. 42 U.S.C. § 13981(b), (c). The statute could not be clearer: it protects all persons and applies to all government officials. There is nothing in the GMVA to suggest that it would not apply to men, to transsexuals, or to prisoners. On the contrary, the plain language of the statute makes it clear that such persons do fall within its purview. Accordingly, as in *Alexander v. Perrill,* 916 F.2d 1392, 1397 (9th Cir.1990), there is no need to "look to decisional law" in order to determine who enjoys the right in question.

 Mitchell's argument, however, also comprehends the points discussed earlier as to what is intended by the provision that a crime of violence must have been committed "because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender." 42 U.S.C. § 13981(d)(1). With respect to that question, the terms of the statute are considerably less clear. Although the GMVA defines a "crime of violence" by reference to state law,[17] which itself may be quite clear, *see* 42 U.S.C. § 13981(d)(2), what constitutes the requisite gender motivation and gender animus is, as the earlier discussion in this opinion makes evident, not so readily apparent from the language of the statute. Thus, although we now hold that a violation of state laws regarding rape or sexual assault necessarily constitutes a violation of the GMVA regardless of the actor's motivation, state of mind or emotions, we also hold that the law regarding gender motivation and animus was not clearly established at the time of the assault. Accordingly, we find that Mitchell.is entitled to qualified immunity with respect to Schwenk's GMVA claim.

## CONCLUSION

In conclusion, the facts and allegations in the record clearly make out a claim for relief under both Section 1983 and the GMVA. Mitchell is not entitled to qualified immunity from Schwenk's claim under Section 1983 for violation of her Eighth Amendment rights. It was well established prior to the attack that Mitchell's alleged conduct constituted a violation of the Eighth Amendment, and no reasonable prison official could have believed otherwise. Although the GMVA does cover Mitchell's alleged conduct, the law regarding the scope and applicability of that statute was not clearly established at the time of the assault on Schwenk, at least with respect to questions of gender motivation and animus. Accordingly, we reverse the district court's denial of qualified immunity to Mitchell with respect to the GMVA claim.

17. In general, the violation of a state or federal statute by an official is not enough to deprive the official in question of qualified immunity, unless that statute or regulation provides the basis for the cause of action sued upon. *See Davis v. Scherer,* 468 U.S. 183, 194 n. 12, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *see, e.g., Carlo v. City of Chino,* 105 F.3d 493, 501 (9th Cir.1997). In this case, state statutes provide only a partial basis for claims under the GMVA. Commission of what constitutes a felony under state law is necessary, but not sufficient to state a claim under the GMVA; rather, the plaintiff must also allege gender motivation and animus.

The decision of the district court is therefore AFFIRMED in part and REVERSED in part.