PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JOSEPH R. PARRISH, Personal
Representative of Tony Marcel Lee,
deceased,

*Plaintiff-Appellee,*

v.

PAUL CLEVELAND,

*Defendant-Appellant,*

and

COMMONWEALTH OF VIRGINIA; FRANK
NEWMAN; KEVIN BALDASSARI; KEVIN
PONSART; PAUL THOMPSON; JOHN
DOOLEY; KEVIN GARLOW; BRIAN
WANCIK; COUNTY OF FAIRFAX; JOHN
THOMAS MANGER, in his official
capacity as Chief of the Fairfax
County Police Department; STAN G.
BARRY, in his official capacity as
the Sheriff of Fairfax County,
Virginia; JOHN DOES 1-20; JANE
DOES 1-20,

*Defendants.*

No. 02-2306

JOSEPH R. PARRISH, Personal
Representative of Tony Marcel Lee,
deceased,
                    *Plaintiff-Appellee,*

                    v.

PAUL THOMPSON; JOHN DOOLEY,
                    *Defendants-Appellants,*

                    and

PAUL CLEVELAND; COMMONWEALTH OF
VIRGINIA; FRANK NEWMAN; KEVIN
BALDASSARI; KEVIN PONSART; KEVIN
GARLOW; BRIAN WANCIK; COUNTY OF
FAIRFAX; JOHN THOMAS MANGER, in
his official capacity as Chief of the
Fairfax County Police Department;
STAN G. BARRY, in his official
capacity as the Sheriff of Fairfax
County, Virginia; JOHN DOES 1-20;
JANE DOES 1-20,
                    *Defendants.*

No. 02-2307

JOSEPH R. PARRISH, Personal
Representative of Tony Marcel Lee,
deceased,

*Plaintiff-Appellee,*

v.

KEVIN GARLOW; BRIAN WANCIK,

*Defendants-Appellants,*

and

PAUL CLEVELAND; COMMONWEALTH OF
VIRGINIA; FRANK NEWMAN; KEVIN
BALDASSARI; KEVIN PONSART; PAUL
THOMPSON; JOHN DOOLEY; COUNTY OF
FAIRFAX; JOHN THOMAS MANGER, in
his official capacity as Chief of the
Fairfax County Police Department;
STAN G. BARRY, in his official
capacity as the Sheriff of Fairfax
County, Virginia; JOHN DOES 1-20;
JANE DOES 1-20,

*Defendants.*

No. 02-2308

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonard D. Wexler, Senior District Judge.
(CA-02-582-A)

Argued: October 30, 2003

Decided: June 18, 2004

Before LUTTIG, WILLIAMS, and KING, Circuit Judges.

Reversed and remanded with instructions by published opinion. Judge
Williams wrote a separate opinion and announced the judgment of the

court. Judge King wrote an opinion concurring in the judgment. Judge Luttig wrote a dissenting opinion.

---

**COUNSEL**

**ARGUED:** Robert Marvel Ross, Assistant County Attorney, OFFICE OF THE COUNTY ATTORNEY, Fairfax, Virginia; John J. Brandt, BRANDT, JENNINGS, ROBERTS & SNEE, P.L.L.C., Falls Church, Virginia, for Appellants. Peter Christopher Grenier, BODE & GRE-NIER, L.L.P., Washington, D.C., for Appellee. **ON BRIEF:** David P. Bobzien, County Attorney, Peter D. Andreoli, Jr., Deputy County Attorney, OFFICE OF THE COUNTY ATTORNEY, Fairfax, Virginia; James R. Parrish, BRANDT, JENNINGS, ROBERTS & SNEE, P.L.L.C., Falls Church, Virginia; David J. Fudala, SUROVELL, MARKLE, ISAACS, DAVIS & LEVY, P.L.C., Fairfax, Virginia, for Appellants. Saul Jay Singer, BODE & GRENIER, L.L.P., Washington, D.C., for Appellee.

---

**OPINION**

WILLIAMS, Circuit Judge:

Early in the evening of May 22, 2001, Fairfax County police officers arrested Tony Marcel Lee on suspicion of being drunk in public. After processing Lee at a substation and placing a "spit mask" over his head, the officers placed the handcuffed Lee in the back of a police van to transport him to an adult detention center, where medical care was available for intoxicated detainees. En route, Lee vomited and later died. An autopsy revealed the cause of death to be aspiration of gastric content and positional asphyxia, with Lee's 0.35 percent blood alcohol content being a contributing cause. Appellee Joseph R. Parrish, acting as personal representative for Lee, brought suit against the five individual officers who handled Lee while he was in custody (the "officers" or "individual defendants"), raising a variety of state and federal claims, including claims that each of the officers violated Lee's Fourteenth Amendment Due Process rights in that each

was deliberately indifferent to a serious risk of physical harm to Lee.[1] The district court denied summary judgment to the officers, summarily rejecting their assertions of qualified immunity. The officers appeal the denial of qualified immunity, and we reverse.

I.

A.

Viewed in the light most favorable to the plaintiff, *Winfield v. Bass*, 106 F.3d 525, 535 (4th Cir. 1997) (en banc), the relevant facts are as follows. On the evening of May 22, 2001, Officer Paul Cleveland of the Fairfax County Police Department, one of the defendants below, responded to a reported larceny at a convenience store. After taking a description of the alleged perpetrators from the convenience store attendant, Cleveland searched the area nearby and discovered a man, later identified as Lee, in a wooded area adjacent to the store who matched one of the descriptions provided by the attendant. Lee was shirtless, appeared to be intoxicated, was drooling from his mouth, and had several cuts and abrasions across his body. Cleveland placed Lee under arrest on suspicion of being drunk in public, handcuffed him in accordance with standard practice, placed him in the back of his cruiser, and drove him to the Mount Vernon Satellite Intake Facility (the police station) for processing. Lee vomited several times along the way to the station. Upon his arrival at the police station, Cleveland was met in the sally port area by Officer Paul Thompson and Deputy Sheriffs Brian Wancik and Kevin Garlow, all of whom are co-defendants in this case. When Thompson arrived at the scene, Lee was lying prone in the back of the cruiser, with his feet in the floorboard area behind the driver's seat and his head on the back seat behind the passenger seat. On the floorboard behind the passenger

---

[1]Parrish also raised claims against Fairfax County, the county police chief, and the county sheriff (collectively, the "municipal defendants"). The district court granted summary judgment to the municipal defendants, which Parrish cross-appealed. We dismissed Parrish's cross-appeal prior to oral argument for lack of jurisdiction in accordance with our holding in *Taylor v. Waters*, 81 F.3d 429, 437 (4th Cir. 1996). Accordingly, we do not discuss further the claims against the municipal defendants.

seat and beneath Lee's head was a quantity of liquid that appeared to be a combination of vomit and mucous. Lee also had some of this substance on his shoulder. After some effort, Cleveland, Thompson, Wancik and Garlow were able to get Lee to sit upright in the back seat of the cruiser with his feet on the pavement outside the cruiser. At this point, the officers observed that Lee had a large quantity of fluid inside his mouth and asked him to spit it out. Lee refused to do so and rolled the contents around in his mouth. Second Lieutenant John L. Dooley, also a defendant in this case, overheard this exchange and recommended that one of the officers get a large garbage can for Lee to spit in. When Lee spat into the garbage can, Deputy Wancik noticed that the substance that Lee expectorated contained "red specks." (J.A. at 684-85.)

Although Lee had not attempted to spit at anyone, Lee was drooling heavily and was intoxicated. Given that intoxicated individuals tend to behave unpredictably and knowing that the officers would be handling Lee, Wancik decided that, based on the red specks he had seen, a "spit mask" should be used on Lee to prevent the spread of any bloodborne pathogens that Lee might be carrying. Wancik retrieved a "TranZport Hood"[2] spit mask from a filing cabinet, removed it from its packaging, and returned to the sally port area where the other officers were attending to Lee.[3] Wancik had no expe-

---

[2]The TranZport Hood is specifically designed to be used on detainees when a risk of officers' exposure to infectious disease is present. The exemplar mask, provided as part of the joint appendix, is shaped like a bag or hood and goes entirely over the detainee's head and neck and consists of three sections. The top-most portion of the mask is made of a fine nylon netting that is open and see-through and covers from the top of the detainee's head to beneath the nose. The middle portion of the mask, beginning below the nose and separated from the top portion by a thin elastic band that is less than one-quarter inch wide, is made of a breathable bacteria-filtering medical fabric that very loosely covers the detainee's mouth and chin area. The medical fabric is not form-fitting, but rather acts as a pouch around the wearer's head. Beneath the bacteria-filtering medical fabric is the bottom-most section, a four-inch sleeve made of a gauzy lightweight elasticized material that fits snugly, although not tightly, around the detainee's neck and is easily stretchable or expandable.

[3]Wancik did not read the directions that the manufacturer included in the mask's packaging. Those instructions state that the TranZport Hood

rience with the TranZport Hood specifically and never previously had used any type of spit mask on a detainee.

Upon returning to Cleveland's cruiser, Wancik asked the other officers if they thought that the spit mask should be used. Like Wancik, the other officers had neither any formal training on the use of the TranZport Hood or any other type of spit mask, nor any direct experience in the use of spit masks. Cleveland, Dooley, and Garlow nonetheless agreed with Wancik that the use of the mask was warranted under the circumstances. Wancik placed the mask over Lee's head while Lee was seated in the backseat of the cruiser, applying the spit mask so that Lee's nose was not covered by the filtering fabric.[4] According to Wancik, the mask fit loosely around Lee's neck, so that if any liquid were to flow into the mask from Lee's mouth, it "easily" would flow out of the bottom. (J.A. at 439.) During the forty-five minutes to one hour from the time that Wancik placed the mask over Lee's head until the time Lee left in the police van, Lee was conscious and able to communicate. During this time period, Lee did not vomit or indicate that he needed to vomit,[5] although he did spit into the mask several times. No one observed any fluid flow out of the bottom of the mask.

---

should not be used on an individual who is vomiting: "DO NOT USE on anyone that is vomiting, having difficulty breathing, or is bleeding profusely from the mouth or nose area." (J.A. vol. V.)

[4]Throughout his opinion, the dissent states that the spit mask fit over Lee's "mouth *and nose*." *See*, *e.g.*, *post* at 31 (emphasis added). Although technically an accurate statement — the mask in its entirety fit over Lee's head — this description of the mask's fit should not create the misimpression that the bacteria filtering medical fabric fit over Lee's nose, which it did not.

[5]Throughout his opinion, the dissent calls Lee a "vomiting man." *Post* at 30, 32, 47. This characterization suggests that Lee was vomiting repeatedly and continuously throughout his detention. As explained in the text above, Lee did not vomit from the time he was unloaded at the station, when, upon the request of the officers, he expectorated the fluid containing the red specks, to some unknown time on the ride to the adult detention center.

After Wancik placed the mask over Lee's head, Cleveland and Thompson escorted Lee into the station. Shortly thereafter, Thompson left the station and had no further contact with Lee. Inside the station, Cleveland conducted a records check on Lee (which revealed that Lee been arrested twenty-one times for being drunk in public between 1987 and 2001) and obtained an arrest warrant charging Lee with being drunk in public, while the other officers monitored Lee. During this time period, the officers noticed a small abrasion on Lee's forehead and decided to call the Fairfax County Fire and Rescue Department to assess this injury as well as Lee's level of intoxication. EMT Kathleen Earl and Firefighter Roosevelt Carson, both of whom were trained emergency medical technicians (EMTs), responded and examined Lee in the station. EMT Earl saw the abrasion through the net portion of the mask, and, given the officers' concern about the possibility that Lee might spit, EMT Earl decided to conduct the examination of Lee without removing the mask. The mask did not hinder EMT Earl's evaluation, and she concluded that Lee's head injury did not require treatment. EMT Earl was told that Lee was intoxicated, and she herself noticed that his demeanor was consistent with a person who was intoxicated — he appeared "sleepy," (J.A. at 1472), and had become "agitated" with a sheriff's deputy who was assisting Earl with the examination, (J.A. at 1470). At some point during her examination, EMT Earl asked the officers about the use of the mask and specifically inquired about what might happen should Lee vomit with the mask over his head. One of the officers (in all likelihood Wancik, although EMT Earl later could not recall which one)[6] explained that the vomit would flow out the bottom of the mask. There is no evidence in the record that EMT Earl, or any other person then present, questioned this assessment of the mask's fit or cautioned the officers about any risk to Lee associated with the spit mask.

After the EMTs had examined Lee and Cleveland had obtained the warrant, the officers determined that, although he was conscious, Lee was too intoxicated to be held at the station, and they decided that Cleveland should transport Lee to the adult detention center where better medical care was available should Lee need it. Dooley directed

---

[6]Because we view the facts in the light most favorable to Parrish, we interpret this evidence to indicate that, on that evening, only Wancik expressed this view about the mask's fit.

that, in accordance with "accepted practice and procedure," Cleveland use a police van that had been specially modified to transport prisoners.[7] (J.A. at 1332.) The front seat of the van was separated from the back area by a metal divider with a small window in the middle. The back of the van was separated into a left chamber and a right chamber by another metal divider that was solid at the bottom and open mesh at the top. The right chamber was sixty-seven inches long and approximately thirty-four inches wide. A thirteen-inch high bench occupied fourteen inches of the width of the chamber, thus leaving a floor space approximately twenty inches wide. The right chamber was slightly narrower than the left and was not visible to the driver of the van through the window. The van had an intercom but, as Cleveland discovered while checking the van, the intercom system was not working.

Once the van was in position, Cleveland, Dooley, Wancik and Garlow carried Lee out to the van. They were accompanied by EMT Earl. In deciding how to place Lee in the van, a number of factors concerned the officers. First, the officers determined that Lee should not be placed on the bench because of the risk he would roll off of it and injure himself. Next, Dooley expressed concern about the possibility of positional asphyxiation, which can occur when an intoxicated person is placed on his stomach with his hands restrained behind his back, and determined that Lee should not be placed on his stomach. Most importantly, Dooley and EMT Earl expressed concern that Lee might vomit while in the van and thus determined that he should not be placed on his back either. Dooley accordingly directed that Lee be

---

[7]There are conflicting statements in the record regarding the motive for transporting Lee in a police van instead of a police cruiser. Officer Dooley testified that, in the backseat of the cruiser, Lee would not remain seated upright and thus might bang his head on the plexiglass divider between the front and back seats, whereas in the back of the van, Dooley and the other officers figured, Lee would have more room to stretch out and would be at less risk of injuring himself. In contrast, Lieutenant Brenda Akre stated that transporting intoxicated individuals in a police van "was the accepted and established procedure because the wagon is much easier to clean up should a prisoner vomit during transport." (J.A. at 1332.) To the extent this evidence is material and conflicts, we view it in the light most favorable to Parrish.

placed on his side on the floor of the van so that his airway would remain open. The officers, in the presence of EMT Earl, complied with Dooley's instruction, placing Lee on his left side on the floor of the van, on the narrower passenger side of the partition. The officers then tilted Lee's head so that his airway would remain free were he to vomit and positioned Lee's legs so that he would remain on his side during the transport. The officers did not remove the spit mask and, in accordance with standard police practice, left Lee's hands cuffed behind his back. No one rode with Lee in the rear of the van.

Cleveland then drove to the adult detention center, a trip that took approximately 30 minutes. Because the van's intercom was not working, Cleveland's ability to hear Lee was impaired.

When Cleveland arrived at the adult detention center and attempted to rouse Lee, Lee did not respond. A sheriff's deputy who was assisting Cleveland then called for medical assistance. Cleveland remained with Lee and continued to attempt to rouse him until the medic arrived. The medic removed Lee's mask and noted that it contained vomit. The medic attempted CPR but was unsuccessful. Lee was then transported to the Inova Fairfax Hospital, where he was pronounced dead at 11:06 p.m. A subsequent autopsy revealed the cause of death to be "aspiration and positional asphyxia" with a contributing cause being "ethanol intoxication." (J.A. at 280.) Lee's blood alcohol content was 0.35 percent.

### B.

Parrish, acting as Lee's personal representative, filed suit against a number of individual officers in their individual capacities, including the five mentioned above,[8] as well as the municipal defendants, alleging violations of federal constitutional law and state tort law. On April 24, 2002, the officers removed the action to the United States District Court for the Eastern District of Virginia, and on August 5, 2002, Par-

---

[8]Prior to the district court's ruling on the motions for summary judgment that are at issue in this appeal, Parrish voluntarily dismissed claims against three officers. The five officers mentioned above — Cleveland, Wancik, Garlow, Thompson, and Dooley — are the only defendants remaining in the action who are being sued in their individual capacities.

rish filed a second amended complaint (the complaint), which remains Parrish's operative pleading. Relevant to this appeal, Parrish alleged in his complaint that the individual defendants violated Lee's Fourteenth Amendment rights in that they acted with deliberate indifference both to a substantial risk of serious harm (Count 1) and to Lee's serious medical need (Count 2), violated Lee's Fourth Amendment right to be free from unreasonable restraint (Count 3), and violated Lee's Fourth and Fourteenth Amendment rights by failing to remedy their colleagues' deprivations of constitutional rights (Count 4). Parrish also asserted claims against the individual defendants under state law for wrongful death (Counts 6 and 7).

After discovery, each individual defendant filed a motion for summary judgment based on the defense of qualified immunity. In an order issued without opinion or any explanation on the record, the district court denied the individual defendants' requests for qualified immunity as to Counts 1 through 4. The individual defendants timely appealed.

## II.

Under 28 U.S.C.A. § 1291 (West 1993), we have jurisdiction to review final orders of district courts. Under the collateral order doctrine, a district court order is final, "even if it does not terminate proceedings in the district court, so long as it conclusively determines the disputed question, resolves an important issue completely separate from the merits of the action, and would be effectively unreviewable on appeal from a final judgment." *Gray-Hopkins v. Prince George's County*, 309 F.3d 224, 229 (4th Cir. 2002) (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949)). Because qualified immunity is an immunity from suit, and not merely an immunity from liability, "it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Accordingly, a district court's order denying a defendant's claim of qualified immunity is a qualifying order under the collateral order doctrine and thus is reviewable immediately. *Gray-Hopkins*, 309 F.3d at 229. We review the denial of qualified immunity *de novo*, using our full knowledge of relevant precedent and limiting our review to the district court's legal conclusions. *Winfield*, 106 F.3d at 529, 535.

A.

To determine whether the individual defendants here are entitled to qualified immunity, we must make a two-step inquiry "in proper sequence." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). As a threshold matter, we must determine whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right." *Id.* at 201. If the facts, so viewed, do not establish a violation of a constitutional right, the inquiry ends, and the plaintiff cannot prevail. *Id.* If the facts do establish such a violation, the next step is to determine whether the right violated was "clearly established" at the time of the alleged offense. *Id.* In determining whether the right violated was "clearly established," we define the right "in light of the specific context of the case, not as a broad general proposition[.]" *Id.* "If the right was not 'clearly established' in the 'specific context of the case' — that is, if it was not 'clear to a reasonable officer' that the conduct in which he allegedly engaged 'was unlawful in the situation he confronted' — then the law affords immunity from suit." *Clem v. Corbeau*, 284 F.3d 543, 549 (4th Cir. 2002) (quoting *Saucier*, 533 U.S. at 201). With this framework in mind, we turn to the specific claim of immunity here.

B.

Although Parrish asserts four independent constitutional claims in the complaint, his claims boil down to one relevant question: whether the individual defendants[9] violated Lee's Fourteenth Amendment rights as a pre-trial detainee through their deliberate indifference to a substantial risk of physical harm to Lee.[10]

---

[9]By the time the officers decided to transport Lee to the Adult Detention Center, the decision that created the risk of harm to Lee, Officer Thompson had left the police station. Therefore, there is no colorable Fourteenth Amendment claim against Thompson, and we reverse on this basis the denial of qualified immunity as to him.

[10]Counts 1 and 2 form the core of Parrish's Fourteenth Amendment claim, and although they technically allege distinct violations — *i.e.*, deliberate indifference to a substantial risk of physical harm (Count 1), and deliberate indifference to serious medical need (Count 2) — the standard of liability is the same, and therefore independent analysis of each

As a general matter, "[o]nly governmental conduct that 'shocks the conscience' is actionable as a violation of the Fourteenth Amendment." *Young v. City of Mount Ranier*, 238 F.3d 567, 574 (4th Cir. 2001) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998)). The degree of culpability on the part of a governmental actor that is sufficient to shock the conscience will depend on the circumstances of any given case. *Id.* In cases where the government is accused of failing to attend to a detainee's serious medical needs, and in cases where the government is accused of failing to protect a detainee from a substantial risk of physical harm, "conduct that amounts to 'deliberate indifference' . . . is viewed as sufficiently shocking to the conscience that it can support a Fourteenth Amendment claim."[11] *Id.* at 575.

"Deliberate indifference is a very high standard — a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999). An officer is deliberately indifferent to a substantial risk of harm to a detainee when that officer "knows of and disregards" the risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In order to be liable under this standard, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* Stated somewhat differently, "[d]eliberate indifference requires a showing that the defendants *actually knew of* and *disregarded* a substantial risk of serious injury to the detainee or that they *actually knew*

---

count is unnecessary. *See Young v. City of Mount Ranier*, 238 F.3d 567, 575 (4th Cir. 2001). Parrish effectively abandoned the alleged Fourth Amendment violation in Count 3 as a basis for sustaining the district court's denial of qualified immunity, and wisely so, as the Fourth Amendment does not govern the treatment of pre-trial detainees. *Riley v. Dorton*, 115 F.3d 1159, 1164 (4th Cir. 1997) (en banc). Finally, liability under Count 4 is entirely derivative of any liability under Counts 1 and 2, and thus requires no separate analysis.

[11]This standard is the same as that which applies in cases arising under the Eighth Amendment, where prison officials are accused of deliberate indifference to a substantial risk of serious harm to prison inmates. *See Young*, 238 F.3d at 575. Accordingly, those cases are relevant to the Fourteenth Amendment claim here.

*of* and *ignored* a detainee's serious need for medical care." *Young*, 238 F.3d at 575-76 (emphases added).

Liability under this standard thus requires two showings. First, the evidence must show that the official in question subjectively recognized a substantial risk of harm. It is not enough that the officers *should have* recognized it; they actually must have perceived the risk. *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). Second, the evidence must show that the official in question subjectively recognized that his actions were "inappropriate in light of that risk." *Id.* As with the subjective awareness element, it is not enough that the official *should have* recognized that his actions were inappropriate; the official actually *must have* recognized that his actions were insufficient. *See Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001).

Although the deliberate indifference standard requires a showing of actual knowledge as to both elements, it "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. Thus, "a factfinder may conclude that [an officer] knew of a substantial risk from the very fact that the risk was obvious." *Id.* But, it is not enough that a reasonable officer *would have* found the risk to be obvious. *Rich*, 129 F.3d at 339-40. Rather, the risk of injury must be "so obvious that the factfinder could conclude that the [officer] *did* know of it because he could not have failed to know of it." *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995). As the Supreme Court explained in *Farmer*, a plaintiff can make a prima facie case under this standard by showing "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it. . ." 511 U.S. at 842. *See*, *e.g.*, *Odom v. S.C. Dept. of Corr.*, 349 F.3d 765, 771 (4th Cir. 2003) (noting, in finding that the prison guards were aware of the risk to the plaintiff, that the guards previously and contemporaneously had been warned that the plaintiff's assailants would attack him if given the chance and had been instructed to remove plaintiff from his recreation cage in light of this risk). Similarly, a factfinder may conclude that the official's response to a perceived risk was so patently inadequate

as to justify an inference that the official actually recognized that his response to the risk was inappropriate under the circumstances.

Having set forth the two general requirements for liability under the deliberate indifference standard, we assess the evidence in the record as to each.

1.

As to the subjective awareness prong, we must assess the extent to which the officers recognized the risk factors attending the detention of Lee, including the indisputably substantial risk that Lee, due to the level of his intoxication, would aspirate his vomit if he were to vomit during his transport to the adult detention center and that he would die as a result. In making this assessment, it is important to remember that to cross the threshold from mere negligence to conscience-shocking deliberate indifference, the officers not only must recognize the facts giving rise to the risk, but they also must draw the additional causal inference. *Rich*, 129 F.3d at 338. Thus, to the extent the officers recognized any risk at all, we are concerned with the risk as they perceived it, not as a reasonable officer under the circumstances should have perceived it, *id.* at 339-40, *Brown*, 240 F.3d at 390-91, and not as it now may be perceived enlightened by the benefit of hindsight, *Grayson*, 195 F.3d at 695.

Our decision in *Rich* is instructive in this regard. Rich, a prison inmate, sued his prison guard, Bruce, on a theory of Eighth Amendment deliberate indifference, because another inmate, Higgins, attacked Rich while Rich was in Bruce's custody. *Id.* at 336-38. On the date of the events giving rise to the suit, Bruce had removed Rich from his cell and placed him in an outdoor recreation area. *Id.* at 337. While Rich was in this recreational area, Bruce removed Higgins from his cell and placed him in an indoor recreation area, despite the fact that prison regulations prohibited the removal of more than one inmate at a time from his cell for recreation. *Id.* While Bruce was returning Rich to his cell, Higgins escaped from the indoor recreation area and attacked Rich. *Id.* The evidence showed (1) that Bruce was aware that Higgins posed a substantial risk to every inmate in the prison and especially to Rich, who previously had stabbed Higgins; (2) that Bruce recognized the general risk that inmates posed to one

another in that particular prison; and (3) that Bruce deliberately violated regulations intended to prevent exactly the kind of inmate-on-inmate violence that actually occurred. We held that these facts were insufficient to justify a finding of deliberate indifference, because the evidence did not show that Bruce recognized the unique risks created by his actions in the case:

> These findings establish that Bruce knew, as a general matter, that Rich was at risk from other inmates, and from Higgins in particular, and that Bruce knew that his actions were in violation of [prison] regulations. They do not establish, however, that Bruce had actual knowledge that his actions uniquely increased these general risks to which Rich was exposed each and every day he was incarcerated in disciplinary segregation at [the prison]. That is, the findings do not establish that Bruce knew that his actions exposed Rich to a specific risk distinct from the general risks of violence from other inmates and Higgins to which Rich was always exposed, and of which Bruce was most certainly aware.

*Id.* at 339. *Rich* thus makes clear that officials can be liable under the deliberate indifference standard only to the extent that they actually appreciate the risk factors in a given case, and only to the extent they make the causal inference that the circumstances as they perceived them created a substantial risk of serious harm. Holding officials accountable for risk factors that they did not actually recognize, while permissible if negligence were the standard of culpability, is not permissible when deliberate indifference is the standard.

Here, there is no dispute that the officers recognized substantial risks associated with their detention and transportation of Lee. They recognized that Lee was highly intoxicated and would need to be held at a facility where medical care was available. They likewise recognized that Lee had suffered an injury to his head, and even though the injury appeared to be minor, they brought in EMTs to evaluate him. In determining how to place Lee inside the van, the officers recognized that placing Lee on the bench was not an option because he might fall off. Importantly, they recognized that, with his hands cuffed behind his back, Lee was at greater risk of positional asphyxiation and thus concluded that he should not be placed on his stomach.

They also recognized that, given Lee's level of intoxication, Lee was at risk of aspirating his vomit were he to vomit and thus concluded that he should not be placed on his back. In short, the officers recognized a host of general risks associated with detaining and transporting intoxicated, handcuffed individuals.

Although it is clear that the officers recognized these more general risks, the evidence does not show that they appreciated the incremental risk that they themselves created by leaving the spit mask over Lee's head during the ride to the adult detention center — *i.e.*, the risk that, should Lee vomit, the spit mask would trap Lee's vomit around his face and effectively defeat the purpose of specially placing him on the van floor on his side with his head tilted.[12]

No direct evidence in the record indicates that the officers were aware of the distinct risk created by leaving the spit mask on Lee. None of the officers have stated that they viewed the mask as increasing the risk to Lee, and there is no evidence that EMT Earl (or anyone else who may have been present from the time the spit mask was placed over Lee's head until the time Lee left the station) warned the officers of any such risk. *Cf. Odom*, 349 F.3d at 771 (noting that the guards themselves demonstrated their recognition of the risk through their own contemporaneous statements).

Nor, after setting aside 20/20 hindsight, as we must in conducting this assessment, *Grayson*, 195 F.3d at 695, does the evidence support a conclusion that officers here "had been exposed to information concerning the [incremental] risk [associated with the spit mask] and thus must have known about it." *Farmer*, 511 U.S. at 842. *Cf. Odom*, 349

---

[12]It is assumed for the purpose of this opinion that the spit mask did, in fact, compound the risk to Lee. The autopsy report on Lee did not specify whether the spit mask was a contributing factor in Lee's death, although the pathologist who conducted the autopsy reportedly thought "that the mask did contribute to . . . Lee's death to the extent, if he was conscious when he vomited, the mask would have gotten moist and affected his ability to breath[, which] would have affected his ability to clear his airway." (J.A. at 1326.) Nevertheless, because the evidence must be viewed in the light most favorable to the plaintiff, the spit mask is considered a contributing factor.

F.3d at 771 (noting that the officers had been warned explicitly about the risk to the plaintiff). That is, the evidence does not show that the incremental risk associated with the spit mask was so obvious as to justify an inference of actual knowledge. First, at least one officer, Deputy Wancik, when viewing the manner in which the mask fit around Lee's neck, came away with the impression that it fit loosely enough such that, in the event Lee vomited, there was "plenty of room for a lot of liquid to kind of exit out." (J.A. at 1272.) That one officer came away with this (perhaps erroneous) impression of the mask's fit suggests that, at that time, the risk was not so obvious to the officers that they could not have failed to know of it.[13] Second, none of the officers had any prior direct experience with this type of mask or any formal training on its use, thus diminishing the plausibility of the inference that the officers actually recognized the risk associated with its use. In the absence of particularized evidence showing that the officers actually had training or experience with the TranZport Hood and therefore were familiar with the manner in which it fit and the uses for which it was designed, it is difficult to conclude that this particular risk was obvious to the officers.

Finally, and most importantly, EMT Earl, a trained medical professional, observed the placement of Lee in the van with the spit mask over his head and expressed no concern. EMT Earl had ample opportunity to assess the spit mask, having earlier conducted an examina-

---

[13]The manner in which the mask used on Lee actually fit around his neck is not well-described in the record. Wancik is the only officer to have expressed an opinion about the mask's capacity to trap vomit, but his view might be called into question by the fact that even though several witnesses stated that they saw Lee spit into the mask, no one saw any fluid flow out the bottom, which of course can be attributed to the fact that Lee did not vomit or spit any appreciable amount of fluid into the mask prior to his transport. Nevertheless, Wancik's view of the mask's fit is not as patently unreasonable as the dissent suggests. *Post* at 43-44. The lower portion of the exemplar mask stretches to a circumference of at least twenty-four inches, and the resilience of its elasticity is minimal. Thus, it is not at all out of the question that after that neck portion had been stretched in placing it over Lee's head, it did not fit snugly around Lee's neck. Wancik's testimony, therefore, to the extent it is probative as to the obviousness of the risk associated with the mask, cannot be disregarded.

tion of Lee's head, during which she evaluated for herself the spit mask's fit and function in light of the risk he might vomit. At the time Lee was loaded into the van, EMT Earl raised again the concern that Lee might vomit and recommended that he be placed on his side. Notably though, she expressed no concern at that time about the spit mask specifically and effectively agreed with the officers that placing Lee on his side was sufficient to mitigate any risk to Lee.[14] And, EMT Earl since has stated that had she perceived any problem with the mask, she would have stated it to the officers at that time. While the EMT's presence by no means immunizes the officers from liability, the fact that a trained medical technician did not recognize the risk associated with transporting a handcuffed inebriated person wearing a spit mask strongly suggests that the risk was something less than obvious.

In sum, the evidence in the record, viewed in the light most favorable to Parrish, shows, at most, that the officers were subjectively aware of the general risks attending the detention and transport of intoxicated, handcuffed individuals. The evidence, however, does not establish that the officers knew the spit mask exposed Lee to a specific risk distinct from the general risks of which the officers were aware. Lest the deliberate indifference standard be transformed into negligence, we can assess the officers' response only in light of the general risks that they actually recognized.

2.

Having ascertained the risk as the officers perceived it, we next

---

[14]The dissent disputes EMT Earl's role in the placement of Lee in the van. Specifically, my colleague posits that EMT Earl could not fairly assess the risks to Lee because she was not told that Lee had been vomiting before the mask was placed over Lee's head. *Post* at 48-50. But, at the time Lee was placed in the van, EMT Earl assessed the potential harm to Lee in full contemplation of the possibility that Lee might vomit, which is demonstrated by her expressed concern that Lee might vomit and her recommendation that he therefore be placed on his side. Thus, whatever EMT Earl was or was not told earlier in the evening has no bearing on her assessment of the risk at the time Lee was loaded into the van.

must determine whether the evidence supports a finding that the officers' response thereto was deliberately indifferent. In *Farmer*, the Supreme Court noted that officials "may be found free from liability if they responded reasonably" to a perceived risk. 511 U.S. at 844. This observation, of course, must be true because if the official's response was reasonable — *i.e.*, not negligent — then *a fortiori* he was not deliberately indifferent. It does not follow, however, that when an officer's response is unreasonable — *i.e.*, negligent — that he is liable for deliberate indifference. Indeed, we have noted that an officer's response to a perceived risk must be more than merely negligent or simply unreasonable. *See Brown*, 240 F.3d at 390-91 ("At most, [the officer's] failure to take additional precautions was negligent [*i.e.*, unreasonable under the circumstances], and not deliberately indifferent."). If a negligent response were sufficient to show deliberate indifference, the Supreme Court's explicit decision in *Farmer* to incorporate the subjective recklessness standard of culpability from the criminal law would be effectively negated. *See Rich*, 129 F.3d at 340 n.2 (explaining this aspect of *Farmer* and noting that "[t]rue subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk"). As one of our sister courts has explained:

> The response demanded of jail officials with actual knowledge of such risk of serious injury is that [they] not act with deliberate indifference. We share the concern . . . that the *Farmer* standard not be transmuted into a negligence inquiry. Deliberate indifference, *i.e.*, the subjective intent to cause harm, cannot be inferred from a prison guard's failure to act reasonably. If it could, the standard applied would be more akin to negligence than deliberate indifference.
>
> We reject the suggestion that the proper measure of the duty to respond of persons with the requisite knowledge ought to revisit negligence. Under that view negligence tossed out the front door re-enters through the back.

*Hare v. City of Corinth*, 74 F.3d 633, 649 (5th Cir. 1996) (en banc) (internal quotation marks omitted).[15] Accordingly, where the evidence

---

[15]Several other circuits have come to the same conclusion. *See Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003) (noting that defendant

shows, at most, that an officer's response to a perceived substantial risk was unreasonable under the circumstances, a claim of deliberate indifference cannot succeed.

In contrast, we recently have found deliberate indifference where the evidence — uncontradicted at the time the qualified immunity determination was made — showed that the officials in question responded to a perceived risk with subjective awareness that their response was inappropriate. *See Odom*, 349 F.3d 765. Odom, a prison inmate, alleged that prison guards had been deliberately indifferent to the substantial risk that Odom's fellow inmates would attempt to kill him. *Id.* at 767. The evidence presented in that case, viewed in the light most favorable to Odom, showed that Odom's fellow inmates started a fire to create an opportunity to attack Odom. *Id.* Because of the fire, inmates were moved from their cells to outdoor chain-link recreation cages. *Id.* Odom explained to prison guards that certain other inmates would attempt to attack him, and the guards placed those inmates in the cage adjacent to Odom. Shortly thereafter, the guards overheard the inmates verbally threatening Odom and observed the inmates tearing down the fence that separated them from Odom. *Id.* at 767-68. In response to this developing situation, other correctional officers directed the defendants to remove Odom from his cage, but the defendants did not do so, and Odom's assailants

---

"was not required to take perfect action or even reasonable action" in response to perceived risk); *Williams v. Kelso*, 201 F.3d 1060, 1064-65 (8th Cir. 2001) (holding that, assuming that jail officials were told to monitor a prisoner's vital signs, "[t]he failure to follow this instruction over a period of about seven hours . . . was a matter of negligence at most; there was not a showing of deliberate indifference"); *see also Burrell v. Hampshire County*, 307 F.3d 1, 8 (1st Cir. 2002) (noting without deciding that "[c]onceivably, a response that was colorable and taken in good faith might still be enough to negate deliberate indifference even if it were inadequate from an objective standpoint (and thus negligent)"). *But see Trammell v. Keane*, 338 F.3d 155, 164 (2d Cir. 2003) (noting that response must be "reasonable" to negate claim of deliberate indifference); *Marsh v. Butler County*, 268 F.3d 1014, 1028-29 (11th Cir. 2001) (en banc) (same); *Beers-Capitol v. Whetzel*, 256 F.3d 120, 132 (3d Cir. 2001) (same) *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001) (same); *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000) (same).

were able to enter his cage and assault him. *Id.* at 768. Instead, the defendants openly mocked Odom and, through their alleged contemporaneous statements, indicated both that they recognized the risk to Odom and that they believed that he somehow deserved to be beaten. One of the officers flippantly observed that the assailants "got th[ei]r snitch;" another scolded Odom, stating, "you should not have snitched on them guys[,] you stupid [expletive]." *Id.* at 771 (alterations in original). In light of this direct evidence that the officers actually welcomed the harm that befell Odom and subjectively realized that the precautions they had taken were inadequate, the panel majority concluded that the evidence, *in the absence of any rebuttal from the defendants*, sufficiently supported a claim of deliberate indifference and thus justified reversing the district court's grant of summary judgment for the defendants and remanding the matter for further proceedings.[16] *Id.* at 772.

In contrast, the record before us here contains no evidence suggesting that these officers recognized that their actions were inappropriate under the circumstances. To the contrary, the evidence shows that the officers believed that their actions were sufficient to mitigate the risks created by Lee's intoxicated condition. The officers decided to transport Lee to the adult detention center where medical help would be available if he needed it and they called in the paramedics to ensure that Lee's head injury did not require treatment. In making the critical decision respecting how Lee should be placed in the van, the officers consulted with a trained medical professional. Recognizing the risks of aspiration and positional asphyxiation, the officers and EMT Earl decided to place Lee on his side and the officers did so. The officers then positioned Lee's legs so that he would remain on his side, and then tilted his head so that his airway would remain free should he need to vomit.[17] Neither EMT Earl nor anyone else then present

---

[16]Suffice it to say, Judge Luttig and I disagreed at the time of the decision in *Odom*, over what the evidence in that case showed. Unfortunately, that disagreement has spilled over into the disposition of this case, and tempting though it may be to address point-by-point the dissent's characterizations of the facts and rationale of *Odom* that, in my view, do not square with the majority opinion in *Odom*, I commend the reader to the majority opinion in that case and urge the reader to contrast it with the dissent's characterization thereof here.

[17]According to the dissent, the evidence regarding how and why the officers placed Lee in the van must be disregarded entirely in favor of

expressed any concern that these precautions would not be sufficient. In short, the evidence shows that the officers took precautions that they believed (albeit erroneously) were sufficient to prevent the harm that befell Lee. There simply is no evidence in the record, in the form of contemporaneous statements or otherwise, to justify an inference that the officers subjectively recognized that their precautions would prove to be inadequate.[18]

---

the view that the positioning of Lee was "nothing more than relatively automatic efforts to shove Lee's legs into the compartment so that they would fit." *Post* at 40. This conclusion is unsupported by the evidence and is at odds with the uncontradicted testimony of EMT Earl. (J.A. at 1476-77.) Because that testimony is uncontradicted and no bases for the impeachment of that testimony have been shown, we cannot ignore it. *See* 9A C. Wright & A. Miller, *Federal Practice & Procedure* § 2527 (2d ed. 1995) (explaining, in setting forth the standard of review for judgment as a matter of law under Rule 50, that "the jury is required to believe . . . uncontradicted and unimpeached evidence from disinterested witnesses"); 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* §§ 2727 (3d ed. 1998) ("If the movant presents credible evidence that, if not controverted at trial, would entitle him to a Rule 50 judgment as a matter of law that evidence must be accepted as true on a summary-judgment motion when the party opposing the motion does not offer . . . evidentiary material supporting the opposing contention . . .").

[18]Just as we disagreed in *Odom* over what the evidence there showed, Judge Luttig and I disagree now over the impact of *Odom* as precedent. While *Odom* has some similarity to the present case because it involved a claim of deliberate indifference to a substantial risk of harm to a detainee/inmate, the similarity between that case and this one ends soon thereafter. In my view, *Odom* is instructive here only in its contrast to the facts of this case. I simply disagree with the dissent's generalized assertion that "[i]t follows necessarily from our holding that the guards in *Odom* were deliberately indifferent to the risk of harm to Odom, that the defendants in this case were deliberately indifferent to the risk of harm to Lee." *Post* at 35-36. *Odom* is easily distinguishable from this case because, as discussed in the text above, there was unrebutted direct evidence that the officers welcomed the harm that befell Odom and that evidence worked to show that the officers were both subjectively aware of the risk to Odom and of the inappropriateness of their response to that risk. *Odom*, 349 F.3d at 771.

Notwithstanding the lack of evidence of subjective awareness of the inappropriateness of the response, the dissent suggests that, because the officers could have taken additional precautionary measures, their conduct is more indicative of deliberate indifference than that which occurred in *Odom*, and thus that a finding of deliberate indifference is mandated here. *Post* at 33-36. Under our precedent, however, the feasibility of additional precautionary measures is rarely probative in a deliberate indifference inquiry. *See Brown*, 240 F.3d at 390-91 (citing *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998) ("Appellant points to all of the actions which [the official] should have taken. Unfortunately, [the official] did not have the benefit of twenty-twenty hindsight, as we do now. Thus, we must examine those precautionary actions which [actually] were undertaken.")*).* As we often have made clear, the question in deliberate indifference cases is not whether the officials could have taken additional precautions — almost invariably, with the benefit of 20/20 hindsight, there are additional precautions that could have been taken — but whether they "*disregard[ed]* an excessive risk to . . . health or safety." *Brown*, 240 F.3d at 390-91 (noting that failure to take additional precautions showed, at most, negligence and not deliberate indifference); *Grayson*, 195 F.3d at 695 (rejecting as "impermissible 20/20 hindsight" the contention that officers should have taken detainee to a medical facility). Moreover, the rule the dissent seems to believe that *Odom* requires "would thrust federal courts into the daily practices of local police departments." *Grayson*, 195 F.3d at 696. As my concurring colleague correctly recognizes, we ought to avoid such "precipitous[ ] interfere[nce]" in "the difficult decisions faced regularly by law enforcement officers." *Post* at 28.

In conclusion, the evidence does not show that the officers here responded with deliberate indifference to the substantial risk of harm to Lee. Accordingly, the district court should have granted the officers' request for qualified immunity. Because Parrish fails the first prong of the qualified immunity inquiry, we need not consider whether the right alleged to have been violated was clearly established under the specific circumstances of this case. *Saucier*, 533 U.S. at 201.

### III.

Before closing, I feel obliged to comment briefly on this chapter in my dissenting colleague's on-going disquisition over the state of

our court's qualified immunity jurisprudence. According to the dissent, our decision today is only the latest in a growing line of cases that are "individually indefensible and collectively irreconcilable," and we as a court are "in need of instruction in the critical areas of our jurisprudence" represented by various of our decisions. *Post* at 31. I, of course, do not agree.

As a preliminary matter, despite the dissent's impassioned but unsubstantiated claim that we have turned the doctrines of qualified immunity and deliberate indifference on their respective heads, the legal analysis conducted here is in lockstep with the precedent of the Supreme Court as well as that of this circuit. Not one of the cases setting forth the doctrine upon which this opinion is based has been reheard en banc, nor has the Supreme Court granted certiorari in any of these cases to correct any errors. To the contrary, the precedent articulated and relied upon here is well-settled and not in serious dispute. (I also recognize that this opinion has no particular precedential value as it represents only my analysis of the case, and only the judgment it represents has been joined by Judge King.)

The more important observation about the dissent's critique is the extent to which it is based on a selective recitation of the facts of our cases. If one were blindly to accept as true the dissent's characterizations of our precedent, his view of our qualified immunity jurisprudence might well be justified. A careful reading of each precedent, however, reveals that, although the dissent begins with a generally accurate assessment of the facts of the cases he pillories, he invariably fails to include factual detail that was highly relevant to the respective panels that decided each of those cases. When one considers all of the facts of these cases, as we are required to do under Supreme Court precedent, an entirely different picture emerges.

For example, the dissent omits facts from his discussion of *Odom* that were highly relevant to the majority's disposition of the case (*e.g.*, the fact that the guards never rebutted the evidence of deliberate indifference; the fact that the prison guards made contemporaneous statements that strongly indicated that they were subjectively aware of the risk to Odom and of the inappropriateness of their response to that risk).

The dissent's discussion of *Bailey v. Kennedy*, 349 F.3d 731, 739-41 (4th Cir. 2003) likewise is incomplete. According to the dissent, the officers in *Bailey* "merely took a suicidal person into custody for psychological evaluation after having been summoned to the scene by an emergency caller who reported that a suicide was imminent." *Post* at 31. The dissent omits, however, that the officers' investigation contradicted the emergency call's report of a suicide risk. Rather than finding a depressed person on the verge of suicide, the first responding officer discovered a man sitting in his own home calmly eating his lunch. During a five-minute conversation with the officer, the man denied any suicidal intentions, and the officer discovered no evidence of preparations for suicide. *Id.* at 740-41. This officer then left the house voluntarily. Because the officers' personal investigation revealed that Bailey was not an imminent suicide risk, we found that the officers' subsequent forceful seizure of Bailey, which resulted in substantial physical injuries to the man, was objectively unreasonable and a violation of clearly established law. *Id.* at 741.

My dissenting colleague's treatment of *Robles v. Prince George's County*, 302 F.3d 262 (4th Cir. 2002), is in accord with his oft-repeated view of that case,[19] but nonetheless suffers from the same defect. Members of the panel that decided *Robles* have responded to my dissenting colleague's criticisms of that decision, and I see no reason to add to that discussion in this case. *See Robles*, 308 F.3d 437, 437-41 (4th Cir. 2002) (Wilkinson, C.J., concurring in the denial of rehearing en banc); *Jones v. Buchanan*, 325 F.3d 520, 535 n.8 (4th Cir. 2003) (Motz, J.).

Finally, I note that the dissent resorts to characterization in attacking my holding as being irreconcilable with existing precedent. In comparing this case to his characterization of *Odom*, the dissent asserts that the only thing the officers did in response to the perceived risk was "lay Lee on his side and send him on his way." *Post* at 32. He omits, however, the fact that is most relevant to the analysis in this

---

[19]*See Robles v. Prince George's County*, 308 F.3d 437, 441-48 (4th Cir. 2002) (Luttig, J., dissenting from the denial of rehearing en banc); *Jones v. Buchanan*, 325 F.3d 520, 535-541 (4th Cir. 2003) (Luttig, J., dissenting); *Altman v. City of High Point*, 330 F.3d 194, 208-10 (4th Cir. 2003); *Odom*, 349 F.3d at 775-81 (Luttig, J., dissenting), *post* at 29-32.

opinion — that the officers placed Lee on his side with his head tilted and feet positioned so that he would remain on his side, all in the presence of, and in consultation with, a trained medical professional who had examined Lee with the spit mask on, who herself recognized the possibility that handcuffed Lee might vomit while being transported to the adult detention center. The dissent disputes the significance of EMT Earl's presence when Lee was loaded into the van, *post* at 48-50, but that fact is significant to both of the judges voting to reverse today. Any discussion of this case *as precedent* that omits this fact is simply misleading.

Supreme Court precedent dictates that, in reviewing claims of qualified immunity, we must pay careful attention to the peculiar facts and circumstances of the case. *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987). Ironically, in excoriating this court for its alleged faithlessness to the dictates of precedent, the dissent itself is unfaithful to this most salient feature of the Supreme Court's modern qualified immunity jurisprudence.

IV.

Lee's death in this case was unquestionably tragic, and as my separately concurring colleague rightly has noted, the officers here "skirted the precipice of deliberate indifference." *Post* at 28. Nevertheless, while the evidence supports the conclusion that the officers here may have acted negligently, their culpability falls short of the conscience-shocking deliberate indifference necessary to sustain Parrish's Fourteenth Amendment claims. For this reason, we reverse the district court's denial of qualified immunity and remand with instructions to grant qualified immunity to each of the five officers.

*REVERSED AND REMANDED WITH INSTRUCTIONS*

KING, Circuit Judge, concurring:

I agree that a violation of Lee's constitutional rights has not been established by the evidence and that the police officers are entitled to qualified immunity; however, this is a close case. I write separately to emphasize my view that, taking the facts in the light most favorable

to Lee, the officers have skirted the precipice of deliberate indifference. The circumstances leading to Lee's death are troubling: (1) Lee was intoxicated; (2) he was unable or unwilling to communicate his needs to the officers; (3) he could not stand up or walk on his own; and (4) he would not or could not spit the vomit from his mouth without being asked repeatedly to do so. And notwithstanding their subjective knowledge that Lee could vomit again, the officers placed the hood over his head and face, and they left him virtually unattended in the back of the police van for about thirty minutes. Although common sense indicates that the officers' actions were inappropriate, those actions do not constitute the conscience-shocking behavior required for a constitutional deprivation. *See Young v. City of Mount Ranier*, 238 F.3d 567, 574 (4th Cir. 2001) ("Only governmental conduct that 'shocks the conscience' is actionable as a violation of the Fourteenth Amendment.") (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). While the officers subjectively knew that Lee could vomit again, they were not deliberately indifferent to that risk. They took measures to ensure Lee's safety: (1) they placed Lee in the van in the presence of a trained medical professional; (2) they placed Lee on his side in the back of the van; and (3) they tilted Lee's head to ensure that, if he vomited, his airway would remain free.

In sum, although the officers' actions may well constitute negligence, they do not meet the stringent standard of deliberate indifference. *See Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard a showing of mere negligence will not meet it."). And, as we have appropriately recognized, courts should not precipitously interfere with or seek to supervise the difficult decisions faced regularly by law enforcement officers. *See id.* at 696 ("To lower this [deliberate indifference] threshold would thrust federal courts into the daily practices of local police departments."). Because the conduct complained of by Lee does not meet the "very high standard" of deliberate indifference, I concur — albeit reluctantly — in Judge Williams's view that this appeal should be decided on that basis. As a result, I would, like Judge Williams, not reach the issue of whether the officers violated a "clearly established" constitutional right.

Consistent with the foregoing, I would recognize the officers' claim of qualified immunity and reverse the district court.

LUTTIG, Circuit Judge, dissenting:

With today's decision, this court completes the turn of both the deliberate indifference and qualified immunity doctrines on their heads, so confounding these two important doctrines that it is literally impossible in the first instance to make principled predictions as to what conduct will and will not be considered to constitute "deliberate indifference," and, upon a finding of such, to make like predictions as to the availability of qualified immunity.

In *Robles* v. *Prince George's County*, 302 F.3d 262 (4th Cir. 2002), the court held that law enforcement officers could not possibly be expected to know that it might be unlawful to handcuff a detainee to a pole in the middle of a deserted shopping-center parking lot, at 3:00 in the morning, and abandon him there, for no law enforcement purpose whatsoever.

After so holding in *Robles*, the court held in *Bailey* v. *Kennedy*, 349 F.3d 731, 739-41 (4th Cir. 2003), *contrary to Robles and without even a citation to that case* — in an opinion by Judge Williams, the author of today's decision — that police officers did violate the Constitution and should have known that their actions clearly violated the Constitution, when they did no more than take an allegedly suicidal person into custody for psychological evaluation, upon responding to an emergency 911 call reporting that that person was intoxicated and depressed, and was going home to commit suicide. This the court held, while acknowledging that there was a "lack of clarity" in the law governing the constitutionality of seizures made for the purpose of psychological evaluation, an acknowledgment which itself should have foreclosed official liability.

Two days later, in *Odom* v. *South Carolina Dept. of Corrections*, 349 F.3d 765 (4th Cir. 2003), *again contrary to Robles and again without even a citation to that case* — in an opinion that Judge Williams joined to form the majority — the court held not only that prison guards could be found deliberately indifferent for an inmate's assault by other violent prison inmates who had torn through their own cages and into the plaintiff inmate's cage during an emergency evacuation, but also that the guards could be held to have known that their actions violated the clearly established constitutional rights of

the assaulted inmate. These holdings, even though the guards were acting in the midst of evacuating the high-security inmates due to a fire in the prison; had purposely placed the aggressor inmates in separate cages from that of the victim, in response to the victim's expressed fears of assault; and had taken affirmative steps to save the victim when the aggressor inmates began to break through from their separate cage into his, retreating only upon personal threat from the uncontrollable inmates — circumstances and conduct which, under established precedent, should have foreclosed even a finding of constitutional violation.

And, today, only a few months after *Odom* was decided, the court holds, *contrary to Odom* — in another opinion authored by Judge Williams — that officials, who loaded a highly intoxicated, vomiting man into the back of a van, with his hands cuffed behind his back and with his head covered with a mask specifically designed to trap fluids excreted from the mouth and nose, and left him unattended, unobserved and unobservable, for the duration of a thirty-minute drive to a detention center — palpable indifference that resulted in the man's death from suffocation on his own vomit — did not even arguably violate any constitutional right of the decedent's, much less any clearly established constitutional right.

Thus, to summarize, this court has held (in *Robles*) that no law enforcement officer could possibly know that it might be a violation of the constitutional rights of a detainee to handcuff him to a shopping center pole and abandon him there in the middle of the night, admittedly for no law enforcement purpose.

The court has held (in *Bailey*, without even a citation to *Robles*) that, although it was not a violation of clearly established constitutional rights (in *Robles*) for officers to handcuff a detainee to a pole in the middle of the night, for no law enforcement purpose whatsoever, it was a violation of clearly established constitutional rights for officers, legitimately responding to an emergency 911 call that an intoxicated and depressed person was going to commit suicide, merely to take the suicidal individual into custody for psychological evaluation purposes.

It has held (in *Robles*) that police officers could not possibly know that it might violate the rights of a detainee to handcuff him to a shop-

ping center pole at 3:00 in the morning and abandon him, but held (in *Odom*, without even a citation to *Robles* (or for that matter *Bailey*)) that prison guards acting during an emergency, who took numerous steps to prevent an assault by violent and uncontrollable inmates, not only violated the rights of an inmate who ultimately was assaulted (by failing to take further steps that were not even specified by the court), but could be held to have violated the inmate's clearly established constitutional rights.

And it has held (in *Bailey*, without even a citation to *Robles*) that officers who merely took a suicidal person into custody for psychological evaluation after having been summoned to the scene by an emergency caller who reported that a suicide was imminent, could be held to have violated the clearly established constitutional rights of the person taken into custody, and (in *Odom*, likewise without even a citation to *Robles*) that prison guards who acted during an emergency to protect an inmate from assault but were unable to prevent that assault by fellow inmates could be held to have violated the clearly established constitutional rights of the assaulted inmate. But it now holds (in *Parrish*, without even a word of discussion of *Bailey*, and with no principled ground for distinguishing *Odom*) that officials who caused the *death* of a person by transporting him, intoxicated, with his hands cuffed behind his back, with his mouth and nose covered by a mask designed to trap fluids from escaping, and unobserved and unobservable, did not even arguably violate any constitutional right of the decedent, much less a clearly established right.

To juxtapose these individually indefensible and collectively irreconcilable holdings one with the other is to confirm that we are a court in need of instruction in the critical areas of our jurisprudence represented by these precedents. In ironic parallelism, we are set on a course of systematically (though I believe unthinkingly) denying to persons their rights not to be subjected to deliberate indifference at the hands of their government, through our own deliberate indifference to the controlling precedent not only of this court, but also of the Supreme Court. And, in testament to our complete inversion of the doctrines of deliberate indifference and qualified immunity, at the same time that we are failing to ensure this basic right to citizens, we are (I believe also unthinkingly) denying to law enforcement officers

their corresponding right not to be punished except for conduct that is in violation of a citizen's clearly established constitutional rights.

## I.

In this case, faced with the understood risk that Tony Marcel Lee might aspirate his own vomit and die (1) if left alone, (2) unobserved and unobservable, in the back of a van, (3) heavily intoxicated (4) with his hands cuffed behind his back, and (5) with his face covered with a spit mask, (6) for the duration of a thirty-minute transport to an adult detention center, the appellant police officers did nothing, nothing at all, but lay Lee on his side and send him on his way. The indifference of these officers to Lee's safety was far more evident and egregious *by any measure* than the conduct this court held unequivocally to constitute deliberate indifference in *Odom*. And this is so, even if one indulges Judge Williams' incredible holding (reminiscent of our like holding in *Robles*) that a reasonable officer could not possibly be expected to realize that putting a mask over a highly intoxicated, vomiting person's mouth and nose — a mask held in place by elastic bands and specifically designed to prevent leakage downwards, *see ante* at 6 n.2 — might contribute to the aspiration and suffocation of that person on his own vomit.

Because *Odom* is unquestionably binding precedent in this case, and insusceptible of principled distinction, I would affirm the district court's denial of summary judgment to appellants and remand the case for trial.

## II.

Importantly, and as she must, Judge Williams admits that the officers "recognized that, given Lee's level of intoxication, Lee was at risk of aspirating his vomit" and she also admits that this risk was substantial. *Ante* at 17. She then proceeds, however, to deny that any reasonable factfinder could find that the officers "appreciated the incremental risk that they themselves created by leaving the spit mask over Lee's head during the ride to the adult detention center — *i.e.*, the risk that, should Lee vomit, the spit mask would trap Lee's vomit around his face and effectively defeat the purpose of specially placing him on the van floor on his side with his head tilted." *Ante* at 17.

For the moment, I will assume *arguendo* the correctness of Judge Williams' assertion that no reasonable factfinder could conclude that the officers recognized the "incremental risk" associated with the spit mask. Even on this assumption, however, Judge Williams still errs in her legal conclusion that appellee has not made out a prima facie case of deliberate indifference, because, under *Odom*, when the facts are truly viewed in the light most favorable to the appellee, appellee has made out a prima facie case of deliberate indifference to the risk that even Judge Williams admits the officers recognized. In particular, under *Odom*, a reasonable factfinder could conclude that the officers were deliberately indifferent to the risk that Lee might suffocate on his vomit during transport to the adult detention center, even had no spit mask been placed over his mouth and nose.

A.

In *Odom*, prison guards were evacuating inmates from a high-security prison to outdoor cages, due to an emergency caused by a fire in the prison. Odom, who had been evacuated along with the other inmates, was attacked and beaten by inmates who were able to break through from their adjoining cage into his. Odom sued the prison guards who had evacuated the inmates, alleging that the guards had been deliberately indifferent to the risk that he would be harmed by the other inmates. The district court granted summary judgment to the guards. This court reversed, holding that Odom's allegations, if believed, established that the prison guards acted with deliberate indifference toward the harm that ultimately befell Odom, because they were aware that inmates were trying to break into Odom's cage and attack him, but failed to do enough to prevent this risk from materializing. 349 F.3d at 769-72. The court so held, even though the defendants were, throughout the events in question, acting in the midst of a prison emergency and had taken a number of affirmative steps to prevent Odom from being harmed at the hands of the other inmates. For instance, the defendants had placed the hostile inmates in a cage separate from Odom's in response to Odom's expressed concerns, and had even attempted subsequently to free Odom as the other inmates tried to break into his cage, retreating only when they were threatened by the inmates with homemade weapons. *See id.* at 771. And the court so held, even though it did not identify a single action that the guards should have taken, but failed to take.

B.

When the facts in this case are viewed in the light most favorable to the plaintiff, it is clear that *Odom* controls our disposition. Indeed, even crediting *arguendo* Judge Williams' holding that no reasonable juror could possibly find these officers were aware that placing over Lee's head a mask designed to trap and hold fluids excreted from his mouth and nose might increase the risk that he would suffocate on his own vomit, the conduct complained of in this case obviously is far less defensible and correspondingly far more indicative of deliberate indifference than the conduct of the guards in *Odom*.

First, in *Odom*, as noted, the court could not even identify any steps that the defendant officers could have taken to prevent the assault on Odom, but held nonetheless that the guards had been deliberately indifferent to the risk of harm to Odom. *See id.* at 771-72. Here, in contrast, there were any number of reasonable and obvious alternative courses of action readily available to the officers other than simply leaving the highly intoxicated Lee handcuffed and unobserved in the back of the van for the ride to the adult detention center. They could have assigned someone to ride in the van, to observe Lee during transportation to the detention center. They could have transported Lee in the back seat of a police cruiser instead of the van, where he could have been observed or at least heard. Or, at the very minimum, they could have placed Lee in the left compartment of the van, from which position he would have been visible to Cleveland during the drive.[1]

---

[1]Judge Williams contests neither that the court in *Odom* could not identify additional measures which the defendant guards in that case could have taken, nor that in this case any number of reasonable alternative courses of action were readily available to the defendant officers. Rather, Judge Williams attempts to deflect attention from any direct comparison between this case and *Odom* with the assertion that "[u]nder our precedent . . . the feasibility of additional precautionary measures is rarely probative in a deliberate indifference inquiry." *Ante* at 24.

I disagree with Judge Williams as to this assertion, but I need not demonstrate its incorrectness. For where, as here, additional precautions are both obvious and easily undertaken, yet are not undertaken despite awareness of a substantial risk of harm, a reasonable factfinder could

Second, in *Odom*, the defendant prison guards were responding to an emergency, evacuating violent, highly dangerous prisoners from their cells to makeshift cages outdoors in order to protect them from fire. And the inmates were uncontrollable even during the evacuation. Here, in contrast, there was no emergency whatsoever confronting the defendants. The officers had an unlimited amount of time to reflect calmly on Lee's transport and to consider measures that would ensure that the risk to Lee that they knew existed would not materialize during the trip to the adult detention center. Indeed, in response to a direct deposition question asking whether he "had time to think about whether the hood should be removed from Mr. Lee before he left in the wagon," Lieutenant Dooley answered in the affirmative. *See* J.A. 175.

Third, in *Odom*, the guards took affirmative steps not only to place Odom in a cage separate from the hostile inmates; they subsequently attempted to free Odom from his cage when it became evident that other inmates were trying to gain access to Odom's cage, withdrawing only when they were threatened with homemade weapons by the violent inmates. *See id.* at 771. Here, in contrast, all the officers did in response to the recognized risk to Lee was to place him on his side in the van — a step that could scarcely be thought sufficient to prevent the danger of Lee aspirating his own vomit, given the possibility that Lee's position could shift during the ride, as in fact it did, *see* J.A. 1503 (reciting that Lee was found lying not on his side, but face down, when the van arrived at the detention center), and the fact that Lee's hands were cuffed behind his back, preventing him from self-help in the event he began to choke.

It follows necessarily from our holding that the guards in *Odom* were deliberately indifferent to the risk of harm to Odom, that the defendants in this case were deliberately indifferent to the risk of

conclude from the obvious availability and feasibility of those additional precautions that an official was subjectively aware of the inappropriateness of his conduct. And such a determination would be directly relevant to the question of whether that official is liable for deliberate indifference, under the very standard which Judge Williams herself sets forth, *see ante* at 13-15.

harm to Lee, even crediting Judge Williams' incredible holding that no juror could reasonably conclude that the officers were aware that putting a spit mask over Lee's mouth and nose might increase the risk that Lee would aspirate and suffocate on his own vomit.[2] Indeed, comparing and contrasting the conduct of the respective officers in the two cases and the surrounding circumstances in which the respective conduct occurred, the instant case is, far and away, a more compelling one for a finding of deliberate indifference than was *Odom*.

C.

Unsettled by the palpable inconsistency between her holding that the alleged conduct in *Odom* did constitute deliberate indifference and her holding that the alleged conduct in this case does not, Judge Williams employs a two-step strategy in an attempt to distinguish *Odom*. First, in Part I of her opinion, in a transparent effort to make the facts of this case appear as distinguishable from *Odom* as possible, Judge Williams describes these facts in the light most favorable to the defendant officers, even as she claims to view them "in the light most favorable to the plaintiff." *Ante* at 5. Second, having so skewed the facts, Judge Williams then claims that *Odom* is distinguishable

---

[2]In a footnote, Judge Williams suggests concern that my statement that the spit mask was wrapped around Lee's mouth and nose "should not create the misimpression that the bacteria filtering medical fabric fit over Lee's nose, which it did not." *Ante* at 7 n.4.

This concern is obviously irrelevant. The risk to Lee, and the risk that ultimately caused Lee's death, was not that Lee would die because the middle portion of the mask would itself directly prevent Lee's breathing, but that Lee would die after vomiting and then inhaling such vomit, which would then proceed to block his windpipe and thus prevent air from reaching his lungs *either* through his mouth *or* through his nose. While this risk of "aspiration on vomit" existed even without the mask, *see*, *e.g.*, *Krueger* v. *Fraternity of Phi Gamma Delta*, 2001 WL 1334996 (Mass. Super. 2001) (wrongful death case in which heavily intoxicated individual *who was not wearing a spit mask* died when he stopped breathing after aspirating vomit while being left alone and unobserved), the mask increased this risk because the middle portion of the mask ensured that vomit, once expelled, would nonetheless remain close to Lee's mouth and thus in optimal position for fatal aspiration into Lee's windpipe.

because in *Odom* there was evidence that the defendants responded "with subjective awareness that their response was inappropriate," while in this case there is none. *See ante* at 21-23.

When the facts of this case actually are viewed in the light most favorable to plaintiff-appellee, however, it is clear that Judge Williams' efforts to distinguish *Odom* fail.

1.

As to Judge Williams' skewed view of the facts, at critical junctures she sets them forth in the light most favorable to the defendant officers.

First, when describing the defendant officers' decision to transport Lee from the station to the detention center in the police van instead of in a cruiser, Judge Williams sets forth as "fact" that "Dooley directed that, in accordance with 'accepted practice and procedure,' Cleveland use a police van that had been specially modified to transport prisoners." *Ante* at 9. To the extent Judge Williams means by this either that Lieutenant Dooley contemporaneously announced that he had decided Lee should be transported in the police van because such was required by "accepted practice and procedure," or even just that Lieutenant Dooley himself was motivated by a recognition of "accepted practice and procedure" in choosing the van over the cruiser, even without announcing such to the other defendant officers, Judge Williams is simply mistaken. No evidence in the record, including evidence from the depositions of the defendant officers themselves, supports either of these propositions. And the page in the Joint Appendix to which Judge Williams cites says nothing whatsoever about Lieutenant Dooley, much less about his motivation. Rather, that page merely states, in relevant part: "[Officer] Cleveland transported Mr. Lee directly to the Adult Detention Center without incident in Mount Vernon's prisoner transport wagon. This was the accepted and established procedure because the wagon is much easier to clean up should a prisoner vomit during transport." J.A. 1332.

Though there is no evidence that Dooley had "accepted practice and procedure" in mind when he directed that Officer Cleveland use the van instead of the cruiser, there is evidence that Dooley had in

mind purely practical concerns that the van would be easier to clean up than the cruiser, in the event that Lee were to vomit en route.[3] Indeed, the notes of Sergeant Jacoby, from an interview with Lieutenant Dooley conducted for purposes of Internal Affairs review only one day after Lee's death, state the following: "Transport in wagon — *easier to clean up*." J.A. 1485 (emphasis added). Given this evidence, coupled with the recognition that the officers had already seen Lee vomit into the cruiser in which Cleveland transported him to the police station, a factfinder could easily conclude that regardless of procedure, the fateful choice between cruiser and van was made for no better reason than that it would be easier to clean the van after Lee's transportation to the detention center.[4]

---

[3]This reason, of course, is the same as the reason behind the "accepted practice and procedure" referenced in the page from the Joint Appendix to which Judge Williams cites. But viewed in the light most favorable to the plaintiff-appellee, this is nothing more than coincidence.

[4]In a footnote, Judge Williams also recounts Lieutenant Dooley's explanation that the choice between the van and the cruiser was motivated by concern that, "in the backseat of the cruiser, Lee would not remain seated upright and thus might bang his head on the plexiglass divider between the front and back seats, whereas in the back of the van, Dooley and the other officers figured, Lee would have more room to stretch out and would be at less risk of injuring himself." *Ante* at 9 n.7. Judge Williams does not appear at this stage to credit Dooley's explanation, however, as evidenced by her subsequent statement that, "[i]n contrast, Lieutenant Brenda Akre stated that transporting intoxicated individuals in a police van 'was the accepted and established procedure because the wagon is much easier to clean up should a prisoner vomit during transport,'" *id.* (citing J.A. 1332), followed by her somewhat opaque pronouncement that "[t]o the extent this evidence is material and conflicts, we view it in the light most favorable to [the plaintiff]."

But this is still far too charitable to Dooley's explanation that the choice between the van and the cruiser was made out of concern that Lee might "bang his head," which explanation was first given by Dooley during a deposition in August 2002, over a year after Lee's tragic death. *See* J.A. 161, 182-83 (deposition of Lieutenant Dooley). First, the explanation given by Dooley during his August 2002 deposition contrasts not only with Lieutenant Akre's statement, but also with Sergeant Jacoby's notes from the interview with Lieutenant Dooley conducted for purposes of Internal Affairs review on May 23, 2001, only one day after Lee's

Continuing her recitation of the facts in the light most favorable to the defendant officers, Judge Williams next sets forth as "fact" that when placing Lee in the van, "the officers determined that Lee should not be placed on the bench because of the risk he would roll off of it and injure himself." *Ante* at 9. Thus, Judge Williams suggests that the officers made a careful and reasoned determination that it would be better for *Lee* if Lee were placed on the floor of the van rather than on the bench. But, especially in light of the admitted fact that there was no discussion whatsoever between the officers about whether Lee should be placed on the bench or on the floor, *see* J.A. 1265, a reasonable juror would not be compelled to find either that any sort of careful and reasoned determination was made or that, if made, such determination was made for the benefit of *Lee* and not for other reasons. Rather, having already concluded that the choice between the cruiser and the van was driven by considerations of the officers' convenience rather then Lee's safety, a reasonable juror could easily conclude that the placement of Lee on the floor instead of the bench was similarly motivated. In particular, a reasonable juror could conclude that due to Lee's extreme state of intoxication, the officers did not even bother thinking about the difficult task of trying to place him on the narrow bench, but simply laid him onto the floor of the van because that was easiest *for them*, without regard to Lee's safety.

Undeterred by the requirement that the facts be stated in the light

---

death, which stated merely: "Transport in wagon — *easier to clean up*," and included no mention of Dooley's concern about Lee "bang[ing] his head." J.A. 1485 (emphasis added).

Second, even apart from the contrasts between Dooley's deposition explanation and other statements in the record, the explanation that the choice between cruiser and van was made out of concern that Lee might "bang his head" makes little sense. In particular, as appellee argues, there was also an obvious and significant possibility that Lee would "bang his head" after being left, extremely intoxicated and unsecured by any seat belt or other restraining device, to slide around on the hard metal floor in the back compartment of the police van, sandwiched between a metal divider on one side and a wooden bench on the other, during the twists and turns of the thirty-minute drive to the detention center. *See* Appellee's Br. at 27; *see also* J.A. at 638.

most favorable to plaintiff-appellee, Judge Williams next presents as "fact" that the officers took care to "position[ ] Lee's legs so that he would remain on his side during the transport." *Ante* at 10. Again, however, a reasonable juror would not be compelled to find that the officers did anything approaching careful positioning of Lee's legs, or that they did such for the purpose of ensuring Lee would remain on his side during transport. Lee, who was five-feet-eight-inches tall, could hardly fit length-wise in the police van compartment, which was only five-feet-seven-inches long. *Compare* J.A. 260 *with* J.A. 1167. In light of this, and given the officers' obvious motive to try to avoid liability by making their actions seem as careful as possible after the fact, a reasonable jury could conclude that what was after-wards described as careful positioning of Lee's legs so he would not roll over was nothing more than relatively automatic efforts to shove Lee's legs into the compartment so that they would fit.[5]

At bottom, when actually viewed in the light most favorable to plaintiff-appellee, the facts show that the officers chose the van over the cruiser for no better reason than their own convenience, despite the risks to Lee's safety, and without any feeling that this choice was required by "accepted practice and procedure"; that they laid Lee onto the hard metal floor of the back of the van without caring about (although fully aware of) the possibility that his position might shift or that he might even hit his head on the floor or sides of the transport

---

[5]In a vain attempt to bolster the officers' statements that they took care to position Lee's legs such that his body would not shift en route, Judge Williams relies on the fact that EMT Kathleen Earl, who observed Lee being loaded into the van but who herself has not been sued in this case, also testified that the officers positioned Lee's legs so he would remain on his side. According to Judge Williams, Earl's testimony as to the posi-tioning of Lee's legs must be believed even at this stage, because it is both "uncontradicted" and "unimpeached." *Ante* at 23 n.17. But in fact, Earl's testimony is neither. First, it is contradicted by the circumstantial evidence that upon arrival at the detention center, Lee's body had shifted, for he was found face down. *See* J.A. 1503. Second, it is impeached by the fact that Earl was not merely a disinterested witness, but also a partic-ipant in the events at the police station. Prior to the commencement of this lawsuit at least, and before it was clear that Earl would not be sued herself, Earl had incentive to make her efforts and the efforts of the defendant officers appear reasonable.

compartment; and that they did nothing approaching careful position-
ing of his legs to ensure he would not roll over, but merely shoved
his feet inside the compartment so they could close the door and send
him on his way. Though a reasonable juror would not be *compelled*
to see the facts this way, a reasonable juror not only *could*, but most
justifiably would, see the facts this way given the record evidence.
Because a reasonable juror *could* see the facts this way, at this stage
we *must* view the facts this way for the purposes of our legal analysis,
including most significantly our analysis of how *Odom* controls the
present case. *See United States* v. *West Virginia*, 339 F.3d 212, 214
(4th Cir. 2003).

2.

Judge Williams' distorted recitation of the facts, by itself, raises
doubts about the credibility of her claim that *Odom* is distinguishable
on the ground that in *Odom* there was evidence that the defendants
responded "with subjective awareness that their response was inap-
propriate," while in this case there is none. I am tempted simply "to
commend the reader to the majority opinion in [*Odom*] and urge the
reader to contrast it with" the facts in this case when viewed in the
light most favorable to the plaintiff. *Compare ante* at 22 n.16
("[T]empting though it may be to address point-by-point the dissent's
characterizations of the facts and rationale of *Odom* that, in my view,
do not square with the majority opinion in *Odom*, I commend the
reader to the majority opinion in that case and urge the reader to con-
trast it with the dissent's characterization thereof here."). But I do not
believe such is appropriate, in this case in which a man's life has been
tragically taken, and in which a factfinder could reasonably and easily
find — given the evidence of record — that the defendant officers
were deliberately indifferent to the possibility of that man's death.
Rather, I feel it incumbent upon me to explain precisely why I believe
*Odom* cannot be distinguished on the grounds that Judge Williams
contends.

According to Judge Williams, *Odom* rested on the ground that the
defendant guards in that case "responded to a perceived risk with sub-
jective awareness that their response was inappropriate," as demon-
strated by the guards' statements openly mocking Odom and
indicating that the guards believed he deserved to be beaten. *See ante*

at 21-22. *Odom* rested on no such ground. Nowhere in *Odom* did the court even set forth, as a necessary element of liability for deliberate indifference, the requirement that a defendant "respond[ ] to a perceived risk with subjective awareness that [his] response [is] inappropriate," much less did its judgment of reversal rest on any such finding.[6] For this reason alone, Judge Williams' attempted distinction of *Odom* is indefensible.

But even were Judge Williams' revisionist characterization of the court's holding in *Odom* correct, *Odom* would still be *in*distinguishable. In this case, there is just as much evidence as there was in *Odom*, if not more, that the officers "subjectively recognized that [their] actions were 'inappropriate in light of [the risk they perceived]." As Judge Williams herself correctly states, "a factfinder may conclude that [an] official's response to a perceived risk was so patently inadequate as to justify an inference that the official actually recognized that his response to the risk was inappropriate under the circumstances." *Ante* at 14-15. Viewing the facts in the light most favorable to plaintiff-appellee as described above, *see supra* at 12-15, a reasonable juror could conclude that doing nothing more than laying Lee on his side was "so patently inadequate" as to justify the requisite inference. Indeed, as Judge King in his separate concurrence candidly admits, "common sense indicates that the officers' actions were inappropriate . . ." *Ante* at 28. If this is true, which it undoubtedly is, then all that a reasonable juror would need to find in order to conclude that these officers acted "with subjective awareness that their [actions] were inappropriate", is that these officers possessed common sense, but simply cared too little about Lee's safety to carry out the clear dictates of that common sense. Given the above-recited record evidence, a reasonable jury could certainly make this finding.

---

[6]*Compare ante* at 13-15 (setting forth, as a necessary element of liability for deliberate indifference, the requirement that "the evidence must show that the official in question subjectively recognized that his actions were inappropriate in light of [the] risk") (citation omitted), *with Odom*, 349 F.3d at 770 (omitting any reference to such a requirement).

### III.

Until this point, I have accepted *arguendo* Judge Williams' incredible holding that a jury could not possibly find that the officers were aware of the risk inherent in putting the spit mask over Lee's head, mouth and nose, for the simple reason that *Odom* requires a holding that a reasonable jury could find these officers to have been deliberately indifferent whether they were aware of this increase to the existing risk or not. But, in fact, this holding is just as unsupportable, factually, as Judge Williams' attempted distinction of *Odom* is, legally.

### A.

The appellee proffered before the district court, and would offer into evidence at trial, exemplars of the TranZport Hood, the exact type of spit mask used on Lee.[7] Judge Williams' own description of the spit mask (which itself foils Judge Williams' later attempts to deny the obviousness of the risks associated with this device) reads as follows:

> The TranZport Hood is specifically designed to be used on detainees when a risk of officers' exposure to infectious disease is present. The [spit mask] is shaped like a bag or hood and *goes entirely over the detainee's head and neck* and consists of three sections. The top-most portion of the mask is made of a fine nylon netting that is open and see-through and covers from the top of the detainee's head to beneath the nose. The middle portion of the mask, beginning below the nose and separated from the top portion by a thin elastic band that is less than one-quarter inch wide, is made of a breathable bacteria-filtering medical fabric that very loosely covers the detainee's mouth and chin area. The medical fabric is not form-fitting, but rather acts as a pouch around the wearer's head. Beneath the bacteria-filtering medical fabric

---

[7]Indeed, using the logic that "[if] a picture is worth a thousand words, . . . a three-dimensional object is worth a million," Tr. of Oral Arg., appellee has even included exemplar spit masks as part of the record in this appeal. *See* 5 J.A. (exemplar of the TranZport Hood).

is the bottom-most section, a four-inch sleeve made of a gauzy lightweight *elasticized material that fits snugly*, although not tightly, *around the detainee's neck* and is easily stretchable or expandable.

*Ante* at 6 n.2 (emphases added). A reasonable factfinder could take one glance at such an exemplar spit mask, which is held in place by an elastic band on the top and elastic material on the bottom, which, even under Judge Williams' description, "*fits snugly*" around the individual's neck, and immediately and reasonably conclude that the officers *must* have been aware that leaving such a spit mask on the unobserved, handcuffed, and extremely intoxicated Lee would increase the already-present risk of Lee suffocating on his vomit and dying during transport to the detention center.[8] In other words, the spit mask itself constitutes ample evidence to justify a finding that the officers understood full well the danger to which Lee was exposed when they affixed the mask to Lee, knowing that he had vomited and might continue to vomit, handcuffed him behind his back, and placed him in the back of the van, unobserved and unobservable, for the duration of the drive to the adult detention center.

---

[8]As I assert in the text, the spit mask, even as Judge Williams describes it, itself provides sufficient circumstantial evidence that the officers were aware of the dangers in leaving it on Lee during his transport to the detention center. That said, however, Judge Williams' description actually represents yet another failure to set forth the facts in the light most favorable to the plaintiff-appellee. In particular, a reasonable factfinder would not be compelled to find that the bacteria-filtering medical fabric covers a wearer's mouth and chin area "very loosely." EMT Earl, indeed, on whose "disinterested" testimony Judge Williams relies extensively in other contexts (although not in this one), *see ante* at 23 n.17, testified that the mask "wasn't real tight and it wasn't loose either," but that "it just fit." J.A. 1473. Nor can it be said that the elasticized material at the bottom which "fits snugly" around the wearer's neck "is *easily* stretchable or expandable." At the very least, this material would not be *easily* stretchable or expandable from the perspective relevant in this case, that of a heavily-intoxicated detainee who has been handcuffed behind the back.

B.

Ignoring entirely the power of the mask itself as circumstantial evidence, Judge Williams constructs a three-pronged rationale to support her holding that "the evidence does not show that the incremental risk associated with the spit mask was so obvious at the time of this incident as to justify an inference of actual knowledge." *Ante* at 18. Judge Williams claims (1) that the mask was sufficiently loose-fitting to convince at least one officer that fluids could simply flow out the bottom, (2) that officers could not possibly recognize any risks associated with using such a spit mask absent specialized training, and (3) that because even a medical technician did not recognize the dangers inherent in use of the mask, those dangers must not be obvious. Each prong of Judge Williams' rationale is as unsupportable on the record before us as is the ultimate conclusion in support of which the rationale is constructed. Indeed, as to each prong of Judge Williams' rationale, Judge Williams either omits directly relevant facts or misstates the facts that she does present.

1.

Judge Williams first states that "at least one officer . . ., when viewing the manner in which the mask fit around Lee's neck, came away with the impression that it fit loosely enough such that, in the event Lee vomited, there was 'plenty of room for a lot of liquid to kind of exit out.'" *Ante* at 18 (citing J.A. 1272). I understand Judge Williams to mean by this, that the mask did in fact fit loosely, and not merely that one officer had the impression that fluid could flow from the bottom of the mask, because if it means the latter, it would be irrelevant to the summary judgment analysis. On this assumption, the evidence that the mask fit loosely is anything but uncontradicted.

To begin with, *Judge Williams' own description of the mask as equipped with elastic material on the bottom that "fits snugly" around the person's neck stands in contradiction to the evidence that Judge Williams describes as supporting the proposition that the mask fit loosely enough for vomit simply to flow out the bottom.* Moreover, in the hearing before the district court and in its brief filed on appeal, appellee emphatically maintained that it was disingenuous for appellants to claim that the mask was loose-fitting enough for vomit simply

to flow out the bottom of the mask, because the officers had observed Lee expelling liquids into the mask but had not seen any liquids flow out the bottom. *See* J.A. 1745-46; *Appellee's Br.* at 20, 40.

And, at oral argument, *in response to questioning from Judge Williams herself* as to the loose-fitting nature of the mask and whether fluids could flow out the bottom, appellee continued to press this position:

> COUNSEL: He expectorated something into the hood, but none of it leaked out.
>
> JUDGE WILLIAMS: Well I thought that it did, that it went down his throat and onto his chest.
>
> COUNSEL: No, no. That was the whole point. That was the point of using this thing apparently.

Tr. of Oral Arg. Indeed, in light of the fact that the "whole point of using" the spit mask was to prevent fluids from leaking out from the face area, it would be entirely reasonable for a jury to reach the conclusion that the officer who, in a deposition taken after appellee filed his lawsuit, described the mask as "extremely loose" so that fluids "would easily flow out the bottom," J.A. 693, was simply dissembling in an effort to avoid liability.[9]

---

[9]EMT Earl also testified that an officer stated to her at the station, in response to her question about what would happen if Lee were to vomit into the spit mask, that the mask had a gap underneath the chin through which vomit could flow out. J.A. 758. Of course, as even Judge Williams' description should make clear, and as inspection of the exemplar spit masks confirms, the mask has no such gap. *See* J.A. at 5. Indeed, it is hard to imagine how any of the officers at the scene could have honestly thought that the spit mask had such a gap. At best for the appellants, therefore, Earl's testimony proves that *one* officer labored under the misconception that the mask had a gap at the bottom to permit the release of fluids. But this is clearly insufficient to award summary judgment to appellants, given the substantial contrary evidence and permissible inference.

It could thus hardly be less tenable for Judge Williams to rely at all on this "evidence" of the mask's loose-fitting nature.

2.

Next, Judge Williams asserts that the officers' lack of "prior direct experience with this type of mask or any formal training on its use . . . diminish[es] the plausibility of the inference that the officers actually recognized the risk associated with its use." *Ante* at 18. In other words, Judge Williams rejects that a reasonable officer in the appellants' shoes could recognize that putting a spit mask of the type described above over a vomiting, highly intoxicated person's mouth and nose, would increase the risk that that person might suffocate on his vomit. This is precisely the kind of reasoning that was employed by the majority in *Robles* v. *Prince George's County*, 302 F.3d 262 (4th Cir. 2002), to hold that officers could not possibly have known that handcuffing a detainee to a pole in the middle of a shopping center at 3:00 in the morning for no law enforcement purpose whatever might violate the detainee's clearly established rights. Given our court's silent, but unmistakable, repudiation of *Robles*, the adoption of this same line of reasoning by Judge Williams here only serves to confirm that her decision today cannot be reconciled with *Odom*.[10]

---

[10]Of course, neither can Judge Williams' holding in this case, that a reasonable law enforcement officer could not be expected to appreciate, without special training, the dangers inherent in putting a spit mask over a highly intoxicated individual's head and then leaving him alone and unobserved, be reconciled with her own opinion in *Bailey* v. *Kennedy*, 349 F.3d 731 (4th Cir. 2003). There, as discussed *supra*, Judge Williams held that a reasonable law enforcement officer *could* be expected to realize that it would be unconstitutional merely to take an individual into custody upon responding to a 911 call that the person was about to commit suicide, even though, as Judge Williams recognized, there was a "lack of clarity" in the law governing the constitutionality of seizures for psychological evaluation purposes. *See id.* at 739-41. The inconsistency between *Bailey*, on one hand, and her decision today, on the other, is at once both palpable and inexplicable.

3.

Finally, Judge Williams focuses on the fact that the officers placed Lee in the van in the presence of a "trained medical professional," EMT Kathleen Earl. In particular, Judge Williams emphasizes that even as Earl observed Lee being placed in the van, she "expressed no concern *at that time* about the spit mask specifically and effectively agreed with the officers that placing Lee on his side was sufficient to mitigate any risk to Lee." *Ante* at 19 (emphasis added). Accordingly, Judge Williams reasons, "the fact that a trained medical technician did not recognize the risk associated with transporting a handcuffed inebriated person wearing a spit mask strongly suggests that the risk was something less than obvious." *Id.* at 19.

Once again, Judge Williams' reasoning is refuted by the evidence in the record. In fact, Judge Williams' assertions that the medical technician "expressed no concern *at that time* about the spit mask specifically and effectively agreed with the officers that placing Lee on his side was sufficient to mitigate any risk to Lee" is fraught with demonstrable inaccuracies.

To begin with, Earl actually *did* express concern to the officers about the specific risk that Lee would vomit into the spit mask. One need look no further for confirmation of this than page nine of Judge Williams' own opinion, where Judge Williams herself states: "*At some point during her examination, EMT Earl asked the officers about the use of the spit mask and specifically inquired about what might happen should Lee vomit with the mask over his head.*" *Ante* at 8 (emphasis added). Because the record shows that this expression of concern occurred not long before Lee was loaded into the van, it is largely irrelevant that Earl failed to *repeat* this concern, which she had previously expressed to the officers, when Lee was loaded into the van only minutes later.

Second, contrary to Judge Williams' statement, EMT Earl *did not* "effectively agree[ ] with the officers that placing Lee on his side was sufficient to mitigate any risk to Lee." In fact, the officers withheld from Earl the most salient information she would have needed even to appreciate the risk to Lee, much less to "effectively agree" that the officers' conduct in doing nothing more than placing Lee on his side

was sufficient to mitigate that risk. For, in response to Earl's initial inquiry as to why a spit mask had been placed on Lee, the officers told Earl not that Lee had been "vomiting," but that Lee had been "spitting." *Indeed, Earl herself testified that it was only after this lawsuit was filed that she first learned that Lee had actually been vomiting before the spit mask was placed on him.* J.A. 757. As the Fairfax County Police Department itself concluded during its internal investigation of Lee's death:

> Upon [the medical technicians'] arrival, Deputy Garlow apparently told [them] that Lee was wearing the Transport Hood because he was spitting. This statement was false, and it prevented the medical technicians from removing the mask for a more thorough evaluation.

J.A. 1331. Because the defendants' false statement prevented Earl from fairly assessing the risks to Lee, who — unbeknownst to Earl — had previously been vomiting, no "effective agreement" with the medical adequacy of the officers' response can be inferred from Earl's actions.

In denying the significance of the officer's failure to inform Earl that Lee had been vomiting, *see ante* at 19 n.14, Judge Williams thus fails to give any credit to the conclusions drawn by the Fairfax County Police Department in its own internal investigation. She also overlooks the fact that while Earl may have been able to guess at Lee's intoxication, she never guessed that he was *so intoxicated that he had vomited several times already*. Indeed, in her deposition, Earl admitted that she made no effort to assess Lee's actual level of intoxication, because she detected no odor, and that she "ha[d] no idea what his level of intoxication was." J.A. 236. (In fact, of course, Lee's actual level of intoxication at that point was at least 0.35, *see ante* at 4, a level which is more than sufficient to cause impairment of perception and mental processes, and almost sufficient to cause unconsciousness).

If anything, then, Earl's role in the events leading to Lee's death actually serves not to *undermine* the obviousness of the risk inherent in the spit mask's use, as Judge Williams asserts, but to *underscore* the obviousness of that risk. Despite the officers' failure to tell Earl

that Lee had actually been seen to vomit already, Earl nonetheless raised of her own accord the concern that Lee might vomit into the spit mask. *See* J.A. 758. From this, a reasonable juror could conclude not only that the risks associated with the spit mask were obvious, *but that these risks actually had been called to the officers' attention and were fresh in their minds at the time they loaded Lee into the van.*

IV.

Under this circuit's precedent in *Odom*, a jury could reasonably conclude that the officers' conduct in this case would constitute deliberate indifference even if the officers were unaware of the specific ways in which use of the spit mask exacerbated the admitted risk that Lee would aspirate on his own vomit. It follows *a fortiori* under *Odom* that a jury could conclude that the officers' conduct constituted deliberate indifference, to the extent that the officers *were* aware that use of the spit mask could increase the risk to Lee of suffocation, yet did nothing more to prevent Lee's death than to turn Lee on his side. Because a jury could readily conclude that these officers were so aware — precisely as this court held that a jury could find that the officers in *Odom* were so aware of the dangers that befell Odom — it is doubly indefensible for the majority to hold that no jury could conclude that the officers' conduct rose to the level of deliberate indifference.

I would affirm the district court's denial of summary judgment to the defendant officers, and I dissent from the majority's refusal to follow *Odom* and do the same.